STATE of Arkansas *ex rel.* Winston Bryant, Attorney General *v.* R&A INVESTMENT CO., Inc., d/b/a Mid South Title Loans; Reican, Inc., d/b/a Mid South Title Loans; and Reid & Reid, Inc., d/b/a Mid South Title Loans

98-198                                                  985 S.W.2d 299

Supreme Court of Arkansas
Opinion delivered February 4, 1999

*Winston Bryant*, Att'y Gen., by: *Teresa Finkelstein*, Ass't Att'y Gen., for appellant.

*Rose Law Firm, P.A.*, by: *Allen W. Bird II* and *Garland J. Garrett*, for appellees.

D ONALD L. CORBIN, Justice.  Appellant State of Arkansas, *ex rel.* Attorney General Winston Bryant, appeals the judgment of the Pulaski County Chancery Court, Second Division, granting summary judgment in favor of Appellees R&A Investment Co., Inc., Reican, Inc., and Reid & Reid, Inc., all of which operate under the name of "Mid South Title Loans" (Mid South).  This appeal involves issues of first impression and requires

our interpretation of the usury provisions contained in Article 19, Section 13, of the Arkansas Constitution, and the Arkansas Deceptive Trade Practices Act (DTPA), as codified at Ark. Code Ann. §§ 4-88-101 to -115 (Repl. 1996 & Supp. 1997); hence, our jurisdiction is pursuant to Ark. Sup. Ct. R. 1-2(a)(1), (b)(1), and (b)(6). We reverse and remand.

Mid South is in the title-pawn business. Mark Riable is the registered agent for each of the three corporations, which runs newspaper ads targeting high-risk borrowers with "Bad Credit" and "No Credit." After receiving complaints from Mid South's borrowers, the State filed suit on April 23, 1997. In its complaint, the State alleged violations of Ark. Const. art. 19, § 13, the DTPA, and public-nuisance law. The State further alleged that Mid South's contracts require borrowers to surrender their car titles as security for repayment and pay monthly interest, or a "monthly pawn charge." The monthly interest is typically equal to 25% of the entire loan amount each month that the loan is not paid in full, and which constitutes an "Annual Percentage Rate" of 304.17%. Mid South's contracts further provide that upon the borrower's default, it "has the right to take whatever steps may be necessary to take possession thereof" at the borrower's risk and expense. Additionally, borrowers must sign a power of attorney, allowing Mid South to sell the vehicle upon repossession. Under the contract, Mid South cannot seek a deficiency judgment after repossession. The complaint alleged that Mid South's business practices constitute unconscionable, false, or deceptive trade practices under section 4-88-107. The complaint alleged further that Mid South's contracts constitute consumer loans and credit sales under art. 19, § 13(b).

The trial court initially granted the State's motion for a preliminary injunction, finding that it had presented a prima facie case that Mid South's practices were unconscionable. On November 3, 1997, both parties moved for summary judgment. The trial court conducted a hearing, during which borrowers testified about the financial circumstances that had precipitated their transactions with Mid South, as well as their subsequent transactions with Mid South. The trial court denied the State's motion for summary judgment and granted Mid South's motion for sum-

mary judgment, thereby concluding that the remedies for usury set forth in Ark. Const. art. 19, § 13, are exclusive, personal, and nonassignable. Although the trial court specifically found that "the [DTPA] and the Arkansas Constitution do not necessarily conflict," it nonetheless concluded "that the Constitution should prevail as the remedy for any alleged victims of [Mid South's] actions." Because the trial court also found that the facts alleged in the complaint supported a usury action, it concluded that the Attorney General lacked standing to bring suit under the DTPA.

■ Summary judgment is appropriate when there are no genuine issues of material fact to be litigated, and the moving party is entitled to judgment as a matter of law. *Nelson v. River Valley Bank & Trust*, 334 Ark. 172, 971 S.W.2d 777 (1998). In making this determination, we view the evidence in the light most favorable to the parties resisting the motion, and resolve all doubts and inferences in their favor. *Id.* The State argues that the trial court erred in granting summary judgment by (1) concluding that the remedies for usury contained in art. 19, § 13, are exclusive, thereby barring its action under the DTPA to protect consumers from unconscionable trade practices; (2) finding that the Attorney General could not file suit under the DTPA because usury is a personal action; and (3) not concluding that Mid South's scheme of openly, continuously, and flagrantly flouting Arkansas usury law constitutes a public nuisance subject to abatement. We agree with the State and hold that the Attorney General has standing to enforce the provisions of the DTPA for unconscionable business practices involving usurious contracts. Because we reverse and remand on that basis, it is not necessary to address the State's public-nuisance argument.

Article 19, Section 13, of the Arkansas Constitution (as modified by Amendment 60) provides in relevant part:

(a) General Loans:

(i) The maximum lawful rate of interest on any contract entered into after the effective date hereof shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract.

(ii)   All such contracts having a rate of interest in excess of the maximum lawful rate shall be void as to the unpaid interest. A person who has paid interest in excess of the maximum lawful rate may recover, within the time provided by law, twice the amount of interest paid. *It is unlawful for any person to knowingly charge a rate of interest in excess of the maximum lawful rate in effect at the time of the contract, and any person who does so shall be subject to such punishment as may be provided by law.*

(b)   . . . All contracts for consumer loans and credit sales having a greater rate of interest than seventeen percent (17%) per annum shall be void as to principal and interest *and the General Assembly shall prohibit the same by law.* [Emphasis added.]

■   The State argues that section 4-88-107(a)(10), which prohibits "[e]ngaging in any other unconscionable, false, or deceptive act or practice in business, commerce or trade," effectively supplements the constitutional provisions above. In *Perryman v. Hackler*, 323 Ark. 500, 916 S.W.2d 105 (1996), this court acknowledged that art. 19, § 13, expressly authorizes the General Assembly to enact legislation to punish parties who knowingly violate the usury provisions. Moreover, the plain language of subsection (b) mandates that the General Assembly prohibit usurious contracts. In this respect, we disagree with Mid South's interpretation that Amendment 60 merely allows the legislature to restate the language found in art. 19, § 13.

■   Similarly, we refute Mid South's reliance on *Perryman*, 323 Ark. 500, 916 S.W.2d 105, for its assertion that the Attorney General lacks standing to enforce the constitution's usury provisions. *Perryman* involved a personal usury action, in which the appellants, who had defaulted on a usurious contract for real property that had been assigned to them, sought to recover for themselves the interest that their assignors had paid before assigning the contract, in addition to the interest that the appellant-assignees had paid. This court allowed the appellants to recover only such interest that they personally paid subsequent to the assignment. Here, the State is not bringing a personal claim for usury. Mid South contended in oral arguments before this court that each of the borrowers must bring an individual action for recovery, while admitting that its interest rates, which exceed 300% per annum,

are usurious. In essence, Mid South requests that we condone its open, flagrant, and continuous violation of the Arkansas Constitution. This we decline to do.

■■ This court has had limited opportunity to address the DTPA, which was enacted under Act 92 of 1971. We summarize our rules of statutory interpretation:

> [T]he basic rule of statutory construction, to which all other interpretive guides must yield, is to give effect to the intent of the legislature. . . . [W]hen a statute is clear, it is given its plain meaning, and that we will not search for legislative intent, rather, that intent must be gathered from the plain meaning of the language used. We are also very hesitant to interpret a legislative act in a manner contrary to its express language unless it is clear that a drafting error or omission has circumvented legislative intent. In interpreting a statute and attempting to construe legislative intent, we look to the language of the statute, the subject matter, the object to be accomplished, the purpose to be served, the remedy provided, legislative history, and other appropriate means that throw light on the subject. We have recognized that changes made by subsequent amendments may be helpful in determining legislative intent.

*State v. McLeod,* 318 Ark. 781, 786, 888 S.W.2d 639, 642 (1994) (citations omitted). The preamble to Act 92 reveals that the legislature's remedial purpose was "to protect the interests of both the consumer public and the legitimate business community[.]" The words "and unconscionable" were added to section 4-88-107(a) and (b) by Act 587 of 1993. Section 4-88-107(b) illustrates that liberal construction of the DTPA is appropriate, as it provides that "[t]he deceptive and unconscionable trade practices listed in this section are in addition to and do not limit the types of unfair trade practices actionable at common law or under other statutes of this state." We thus refute Mid South's contention that section 4-88-107(a)(10), which prohibits "any other unconscionable, false, deceptive act or practice" is too vague for enforcement. This catch-all provision was, no doubt, included because the General Assembly could not be expected to envision every conceivable violation under the DTPA.

■ As this action is based on admittedly usurious contracts, we rely on this state's established contract law to define "unconscionable." Although this court has not directly addressed this particular issue, our court of appeals has established a test for determining unconscionability in contract cases. In *Arkansas Nat'l Life Ins. Co. v. Durbin*, 3 Ark. App. 170, 174-175, 623 S.W.2d 548, 551 (1981), the court of appeals explained:

> In assessing whether a particular contract or provision is unconscionable, the courts should review the totality of the circumstances surrounding the negotiation and execution of the contract. Two important considerations are whether there is a gross inequality of bargaining power between the parties to the contract and whether the aggrieved party was made aware of and comprehended the provision in question. *Geldermann & Company, Inc. v. Lane Processing, Inc.*, 527 F. 2d 571 (8ᵗʰ Cir. 1975); *see also, Mississippi Home Insurance Company v. Adams*, 84 Ark. 431, 106 S.W. 209 (1907).

*See also Associated Press v. Southern Arkansas Radio Co.*, 34 Ark. App. 211, 809 S.W.2d 695 (1991) (holding that under the Uniform Commercial Code, the determination of unconscionability is a mixed question of fact and law).

■ Here, the trial court specifically concluded that the State had established a prima facie case that Mid South's business practices were unconscionable. The trial court also concluded that section 4-88-107(a)(10) does not conflict with the usury provisions set forth in art. 19, § 13. Moreover, the purpose of Arkansas's strong anti-usury policy, as reflected by the prohibition of usury in our constitution, is to protect borrowers from excessive interest rates. *Quinn-Moore v. Lambert*, 272 Ark. 324, 614 S.W.2d 230 (1981). The General Assembly's intent to protect consumers by passing the DTPA promotes the purposes of art. 19, § 13, by making its provisions effective for consumers who are not likely to have financial means to obtain legal assistance to bring individual actions, who are unlikely to be aware of their legal rights, and who have no choice but to continue paying illegal rates, while Mid South knowingly violates the law.

■ We therefore hold that the DTPA is broad enough to encompass Mid South's scheme, which is contrary to Arkansas's

policy against usury, and is, in fact, designed not merely to evade the law, but to intentionally and deliberately violate our constitutional prohibition against usury. We further hold that the Attorney General has standing to enforce the provisions of the DTPA in this scheme involving such unconscionable practices. Because we hold that Mid South's continuous and flagrant violations of the constitutional prohibition against usury are unconscionable practices, as envisioned by the General Assembly under the DTPA, we need not address the issue of whether Mid South's actions should be declared a public nuisance. Accordingly, we reverse and remand for judgment consistent with this opinion.