Marcus G. CARTER and Commerce Alliance, Inc. *v.*
FOUR SEASONS FUNDING CORPORATION

01–1315 97 S.W.3d 387

Supreme Court of Arkansas
Opinion delivered February 6, 2003

642

*Williams & Anderson LLP*, by: *Peter G. Kumpe* and *Stephen B. Niswanger*, for appellants.

*Cuffman & Phillips*, by: *Stephen K. Cuffman*, for appellee.

R OBERT L. BROWN, Justice. Appellants Marcus G. Carter and Commerce Alliance, Inc., appeal a judgment in favor of Four Seasons Funding Corporation (Four Seasons) in the amount of $313,836.79 and the imposition of a constructive trust on various outstanding accounts receivable and proceeds. Appellants raise four points on appeal: (1) the circuit court erred when it held that the two agreements between the

parties established purchases rather than usurious loans; (2) the circuit court misconstrued the agreements to permit Four Seasons to retain non-factored proceeds; (3) the circuit court erred when it awarded damages to Four Seasons that varied from the terms of the contract; and (4) the circuit court erred when it imposed a constructive trust on accounts receivable and proceeds when there was an adequate remedy at law. We affirm the circuit court.

The facts in this matter, which are undisputed, are taken largely from the memorandum opinion of the circuit court entered June 14, 2001. At all times relevant to this appeal, appellant Marcus Carter was the sole shareholder of several Arkansas corporations which he used in his business dealings, including Commerce Alliance, Inc. Commerce Alliance was an Arkansas corporation that contracted with customers to assist them in making bids to federal government agencies for the purchase of certain supplies. Commerce Alliance showed its customers how to submit bids which complied with the complicated and exacting procedures and formats required by the government agencies. If a government agency accepted a bid, the agency would then issue a purchase order to the customer which set out the supplies, purchase price, and delivery terms. Under the Commerce Alliance contract, customers assigned their rights in these purchase orders to Commerce Alliance, and Commerce Alliance contracted, in turn, with third-party suppliers to meet the terms of the purchase orders. In some cases, these third-party suppliers required an up-front payment before they would ship the supplies to the government agency, and Commerce Alliance advanced this payment on behalf of its customer. Upon receiving notification of the delivery of conforming supplies, Commerce Alliance issued an invoice to the government agency, instructing it to remit payment to Commerce Alliance or its designated agent. In accordance with its customer contract, Commerce Alliance kept a percentage of the profit on the invoice, paid any balance due to the supplier, and paid the rest to its customer.

The "designated agent" referred to in Commerce Alliance's invoices was Alliance Escrow, Inc., another corporation where Mr. Carter was sole shareholder. Alliance Escrow was organized to serve as the escrow agent under the contract between Com-

merce Alliance and its customers. The government agencies typically paid on the purchase orders via electronic funds transfer to a checking account maintained at Pulaski Bank & Trust in Little Rock, although some payments were made by mail. When a payment was paid into the account, Alliance Escrow would pay the vendor for the supplies and then remit the appropriate amounts to Commerce Alliance and its customer, in accordance with the customer contract. At times, Commerce Alliance would not have enough funds on hand to advance payment to the third-party suppliers. The need for capital led to the financial arrangement between Four Seasons and Commerce Alliance that is the subject matter of this litigation.

### a. The Purchase Agreement

On January 13, 1998, Four Seasons agreed to purchase accounts receivable from Commerce Alliance under the terms of a Purchase and Sale Agreement ("Purchase Agreement"), which Four Seasons prepared. The agreement provided that Commerce Alliance would sell, transfer, and assign "all of the seller's rights, title and interest" in certain accounts receivable to Four Seasons. The purchase price that Four Seasons would pay for an account receivable would be equal to the face value of the account minus a discount, minus some adjustments for items like long-distance, copies, postage, and the like. The discount was calculated by using a "discount schedule," which tied the amount of the discount to the length of time it took to collect the balance on the account. The discount schedule set the discount at three percent for accounts collected within fifteen days. The discount then increased by three percent for every subsequent fifteen-day period (6% for 16-30 days, 9% for 31-45 days, and so on).

The Purchase Agreement specified that the purchase price of the account receivable would be paid by Four Seasons by an initial payment of 65% of the face value of the account. Because the exact purchase price would not be known until the account was paid by the government agency and the discount schedule had been applied, payment of the remainder of the purchase price was held in abeyance. After the government agency paid the account receivable in full, Four Seasons would then make a final payment

on the purchase price equal to the full amount of the account assigned to Commerce Alliance, minus the initial payment, minus the discount amount.

Commerce Alliance made certain warranties and representations in the Purchase Agreement regarding the accounts receivable. It represented that it was the sole owner of the accounts, that there were no set-offs applicable to the accounts, that there were no deductions or disputes with respect to the accounts, and that each account would be due and collectable within ninety days without the need to resort to litigation.

The Purchase Agreement also provided for a right of recovery against Commerce Alliance if any of the warranties or representations in the agreement were breached. The agreement stated that Four Seasons would have no such right against Commerce Alliance, unless an event defined as a breach elsewhere in the contract occurred. For example, the agreement stated that if an account turned out not to be collectable within ninety days for any reason except bankruptcy of the debtor, Commerce Alliance would be in breach. As a remedy for breach, Four Seasons was allowed to take a credit against the reserve of proceeds from other factored accounts, or it could require Commerce Alliance to repurchase the account. Additionally, Commerce Alliance granted Four Seasons a security interest and lien against all of Commerce Alliance's existing and future accounts and proceeds, whether factored or not. Finally, the Purchase Agreement provided that Mr. Carter personally guaranteed all obligations of Commerce Alliance under the agreement.

## b. The Addendum

Four Seasons's normal practice, as a purchaser of accounts receivable, was to put account debtors on notice that it was the new owner of the accounts in question. After Commerce Alliance sold the accounts receivable to it, Four Seasons tried unsuccessfully to notify one government agency of the factoring arrangement. It then asked to notify all government agencies that payment on the account should be remitted to it instead of to Commerce Alliance. Commerce Alliance balked at this request.

It gave as its reason the fact that it typically financed its accounts at a late stage in the business process and that the government agencies' rather rigid policies would not tolerate a change in payee at that late date.

To resolve the dilemma, Mr. Carter proposed that Four Seasons take control of the Pulaski Bank account, which was in the name of Alliance Escrow and to which the debtor government agencies would remit payment. On November 19, 1998, an agreement to that effect was memorialized in an Addendum to the Purchase Agreement. The Addendum was drafted by Mr. Carter and signed by Carter/Commerce Alliance and Four Seasons. Commerce Alliance agreed in the Addendum that two officers of Four Seasons would be signors on the account, that it would turn over all checks to Four Seasons, and that it would not make any withdrawals from the Pulaski Bank account during the term of the factoring agreements. Proceeds from all Commerce Alliance accounts would flow into the bank account. Because of this, the Addendum provided that Four Seasons was not allowed to apply a discount fee to any account except accounts that Commerce Alliance had sold to Four Seasons and that Four Seasons would remit the proceeds of non-assigned accounts to Commerce Alliance.

The parties did business under the factoring agreement from November, 1998, to July, 2000. Commerce Alliance, however, did not sell all of the accounts paid into the Pulaski Bank account to Four Seasons. The parties followed this arrangement until May 1999. At that time, Mr. Carter shut down Commerce Alliance and transferred its assets to Alliance Escrow without formally giving notice of that fact to Four Seasons.[1] For a time, all accounts that Mr. Carter factored were owned by Compusoft of Missouri, Inc., a corporation solely owned by Mr. Carter. Four Seasons records, however, continued to list the factored accounts under the name Commerce Alliance. Later, however, the assets of Compusoft of Missouri were also transferred to Alliance Escrow.

---

[1] The circuit court did find that Four Seasons had constructive notice of this closing by virtue of the fact that after May 1999, the fax transactions were done by Alliance Escrow and the telephone was answered in Alliance Escrow's name.

Over time, several accounts receivable which had been assigned to Four Seasons under the Purchase Agreement became due and were uncollectable for a period of time longer than 90 days. As a result, beginning on September 21, 1999, Four Seasons applied the proceeds of non-factored accounts toward its delinquent accounts. No discount fee was assessed by Four Seasons against the proceeds from non-factored accounts.

On September 23, 2000, while there were proceeds in Pulaski Bank representing funds owed to Four Seasons for factored accounts, Mr. Carter removed Four Seasons's officers as signors on the Pulaski Bank account. More money owed to Four Seasons came into the account, after Mr. Carter removed the Four Seasons officers. When Pulaski Bank became uncertain as to who was entitled to payment of a $27,000 check drawn on the account, it filed an interpleader complaint and named Four Seasons, Marcus Carter, Alliance Escrow, and Commerce Alliance as defendants.[2]

On November 17, 2000, Four Seasons filed a third-party complaint against Commerce Alliance and Mr. Carter seeking: (1) an accounting of all proceeds received from accounts receivable sold to Four Seasons, which totalled $316,616.70, according to an attached exhibit; (2) a mandatory injunction requiring payment into the registry of the court for such accounts receivable paid; and (3) monetary damages. Mr. Carter and Commerce Alliance answered and counterclaimed on the basis that these financial transactions were, in reality, not sales but were disguised usurious loans and that Four Seasons's attachment of proceeds from non-assigned accounts breached their agreements and constituted conversion. They sought damages from Four Seasons in an amount equal to the non-factored proceeds that had not been remitted, lost profits, and twice the amount of the usurious interest paid.

On March 21, 2001, Four Seasons moved for summary judgment based on the relief prayed for in its third-party complaint. It attached as an exhibit a spreadsheet which detailed the face amount of outstanding accounts, totalling $316,616.70, and also

---

[2] Bank of America was also an original defendant but was dismissed from the case at an early stage.

accrued discount fees of $248,636.68. The total of the 65% of the face value already paid to Commerce Alliance and accrued discount fees was shown as $441,339.23. On March 22, 2001, the parties argued their cross-motions for summary judgment. The circuit court denied the motions and the case proceeded to trial. On March 26 and 29, 2001, the case was tried to the circuit court in a bench trial.

At trial, Mr. Carter testified that the transactions had been loans "from day one." He further testified about the Addendum, which, he said, he drafted to avoid giving notice to the government agencies that Four Seasons was now the payee on the sold accounts. He described the federal regulations that he had to comply with in order to sell accounts receivable and have the government pay the assignee directly. He stated that the government requires a novation agreement in order to accomplish this and testified that he did not enter into a novation agreement with Four Seasons. He admitted to closing down Commerce Alliance in Arkansas. Richard Schwartz, a CPA, then testified on behalf of Mr. Carter that if the transactions were loans, then the rate of interest would be well above the constitutional usury limit. The lowest interest rate, he contended, was 76.76% per annum.

Gregory Young, the Secretary of Four Seasons, testified that he learned only through discovery in the case that Commerce Alliance had been closed in May of 1999 and that its assets had been transferred to Alliance Escrow. He further testified that Four Seasons was not in the business of lending money and that Four Seasons treated the financial transactions with Commerce Alliance as sales, both on its books and in its tax returns. He added that Four Seasons would not have purchased accounts receivable without the warranty of collectability and the recourse provisions against the seller being included in its Purchase Agreement. He stated that if Four Seasons had agreed to eliminate the warranty and recourse provisions, the discount charge to Commerce Alliance would have increased because the risk would have been greater. He also testified that Four Seasons was seeking the face amount of the accounts receivable in its lawsuit. Michael Forehand, the president of Four Seasons, testified that Four Seasons had no control over when the purchase orders would be paid by

the government agencies but that Commerce Alliance had some control. He also testified that Four Seasons was not seeking to collect accrued discount fees of $248,636.68, but only the face amounts outstanding on the factored accounts, which totalled $316,616.70.

Christopher Barrier, a Little Rock attorney, testified as an expert for Four Seasons on what was typically included in factoring contracts. He stated that he was experienced in the drafting and reviewing of transactions similar to the one at issue in this case and that the seller of accounts receivable will typically obtain a higher price if the seller agrees to buy back the accounts if they are not paid on schedule. He testified that it was common to have warranties of collectability and recourse provisions. He testified that these provisions will ordinarily net a seller of accounts receivable a higher price, because a factor is willing to pay more for an account if the factor has assurances that it will be paid by the seller if the debtor does not pay. He also testified that, based on the agreements he had reviewed during his career, a security agreement in the seller's other accounts receivables was typical in the event of a breach of the warranty that the accounts could be collected within a certain period of time. He added that a discount schedule, where the purchase price rises if the account is collected over a longer period of time, was commonplace.

The circuit court issued an eighteen-page memorandum opinion in which the court awarded damages against Mr. Carter in the amount of $313,836.79.[3] The court also directed that Alliance Escrow file an accounting of all accounts receivable with the court within ten days, whether the records had been assigned to

---

[3] The circuit court offset the amounts Four Seasons held in reserve on unpaid accounts ($13,500 and $603.42) against the $316,616.70 claimed. The court then awarded $13,735.39 in prejudgment interest and $25,088.12 in attorneys' fees and credited the amount originally interpled of $27,000 to arrive at the total judgment amount. The court is aware that the judgment appears to reflect a $500 discrepancy, the source of which is not apparent from the record. The parties do not dispute the computation of damages and so we uphold the circuit court's calculation.

Four Seasons or not.[4] The court finally imposed a constructive trust on all accounts receivable and proceeds of Mr. Carter and his companies and directed that the proceeds be paid into the registry of the court to satisfy the judgment. With respect to Commerce Alliance's counterclaim that Four Seasons first breached the Purchase Agreement and Addendum, had converted non-factored proceeds, and engaged in disguised usurious loans, the circuit court concluded that Commerce Alliance had failed to meet its burden of proof. Judgment was entered in favor of Four Seasons.

## I: Usurious Loan or Sale

For their first contention on appeal, Mr. Carter and Commerce Alliance argue that the financial transactions between Commerce Alliance and Four Seasons were a subterfuge for usurious loans. Four Seasons, on the other hand, argues as it did before the circuit court that the transactions were factored sales of accounts receivable. We address, as an initial matter, our standard of review.

■ The appellants correctly point out that Amendment 80 to the Arkansas Constitution did not disrupt this court's standard of review in chancery cases. As this court recently held:

> This court has traditionally reviewed matters that sounded in equity *de novo* on the record with respect to fact questions and legal questions. *Con-Agra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000); *Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979). We have stated repeatedly that we would not reverse a finding by a trial court in an equity case unless it was clearly erroneous. *Con-Agra, Inc. v. Tyson Foods, Inc., supra*. We have further stated that a finding of fact by a trial court sitting in an equity case is clearly erroneous when, despite supporting evidence in the record, the appellate court viewing all of the evidence is left with a definite and firm conviction that a mistake has been committed. *Id.* These common law principles continue to pertain after the adoption of Amendment 80 to the Arkansas Constitution, which was effective on July 1, 2001.

---

[4] Alliance Escrow was named as a defendant in Pulaski Bank's interpleader action, but was not a party to Four Seasons' third-party complaint or Commerce Alliance's counterclaim. Nor is it a party to this appeal.

*Lewellyn v. Lewellyn*, 351 Ark. 346, 93 S.W.3d 681 (2002).

## a. Usury Law

■ Arkansas's usury law is set out in the Arkansas Constitution: "The maximum lawful rate of interest on any contract . . . shall not exceed five percent (5%) per annum above the Federal Reserve Discount Rate at the time of the contract." Ark. Const. art. 19, § 13(a)(i) (1987). Usurious contracts are void as to the amount of usurious interest, Ark. Const. art 19, § 13(a)(ii), and a party who has been subjected to usurious interest is entitled to recover double the amount of such interest. *Id.*

■ Courts in Arkansas are obligated to look beyond the four corners of the document in question to determine, considering all of the attendant facts and circumstances, if the contract is usurious in effect. *State ex rel. Bryant v. R & A Inv. Co., Inc.*, 336 Ark. 289, 296, 985 S.W.2d 299, 303 (1999); *see also McElroy v. Grisham*, 306 Ark. 4, 8, 810 S.W.2d 933, 936 (1991) ("The law shells the covering and extracts the kernel. Names amount to nothing when they fail to designate the facts." (quoting *Sparks v. Robinson*, 66 Ark. 460, 463-464, 51 S.W. 460, 462 (1899))); *Standard Leasing Corp. v. Schmidt Aviation*, 264 Ark. 851, 855, 576 S.W.2d 181, 184 (1976) ("In determining if a contract is usurious we look to its substance, not to its form."). *Accord General Electric Credit Corp. v. Robbins*, 414 F.2d 208, 210 (8th Cir. 1969) ("The law will not tolerate any camouflage disguising a usurious transaction to make it seem innocent.") (applying Arkansas law) (internal citations and quotations omitted).

■ Because the "penalty for a usurious transaction is indeed heavy," the burden is on the plaintiff to show usury by clear and convincing evidence. *Haley v. Greenhaw*, 235 Ark. 481, 360 S.W.2d 753, 757 (1962). Clear and convincing evidence is that evidence which produces a firm conviction in the factfinder that the allegation at issue is true. *Baker v. Arkansas Dept. of Human Servs.*, 340 Ark. 42, 8 S.W.3d 499 (2000). "[W]hen the intention is not apparent, it is a question for the jury to determine whether it was a *bona fide* credit sale, or a device to cover usury." *Haley*, 235 Ark. at 488, 360 S.W.2d at 758 (quoting *Hare v. Gen-*

*eral Contract Purchasing Corp.*, 220 Ark. 601, 249 S.W.2d 973 (1952)).

### b. Usury Law and Factoring Contracts

■ ■ Four Seasons contends that it is engaged in the business of factoring accounts, not lending, and that the Purchase Agreement was a factoring contract. Factoring is defined as: "The purchase of accounts receivable from a business by a factor who thereby assumes the risk of loss in return for some agreed discount." *Webster's New Third International Dictionary* (1961). A factor buys accounts receivable at a discount, the factor's seller obtains immediate operating cash, and the factor profits when the face value of the account is collected. *See* Irving Kellogg, *The Lawyer's Use of Financial Statements* 143 (Univ. of Calif. Press 1967).

■ We had occasion to discuss the sale of a promissory note at a discount and whether that was usurious in *Haley v. Greenhaw, supra*. In *Haley*, the plaintiff had tried to set aside the assignment of certain mortgages by her ex-husband. The question was whether the sale of a promissory note at a discount, with a general endorsement, for a sum greater than the maximum rate of interest was usurious. The court considered the behavior of the parties important, and found that there was "not one single shred of evidence that would indicate that the . . . transaction was actually a loan, rather than a sale." *Haley*, 235 Ark. at 487, 360 S.W.2d at 757. The court also found it significant that none of the parties had tried to conceal the nature of the sale. Moreover, the language of the assignment was that of a sale, not a loan. *Id.* at 488, 360 S.W.2d at 757. ("The language of the written assignment . . . provides that [the sellers] 'grant, bargain, sell, assign, transfer, set over, delivers, and convey . . . all of their right, title, and interest in and to one certain mortgage together with the notes, debts, and claims secured by said mortgage."). The court observed that these factors did not conclusively prove the absence of usury but noted that the burden was on the appellant to prove that issue to the jury by clear and convincing evidence if the intention was in doubt. This, she had not done, and the court affirmed the trial court.

### (i) Other Jurisdictions

The issue of whether a factoring contract is, in fact, a disguised loan is an issue of first impression in Arkansas. Because of this, Mr. Carter and Commerce Alliance argue that there are a set of factors in general use by other courts that weigh in favor of classifying the factoring agreement in this case as a usurious loan rather than a sale.

■ For the most part, we are persuaded that this issue turns principally on the intent of the parties as well as other attending factors. As one legal publication has concluded: "examination of court decisions addressing the true sale question reveals the absence of any discernable rule of law or analytical approach in the courts, other than the vague standard that a transaction should be characterized according to the intent of the parties indicated by the surrounding facts and circumstances." Robert D. Aicher & William J. Fellerhoff, *Characterization of a Transfer of Receivables as a Sale or a Secured Loan Upon Bankruptcy of the Transferor*, 65 AM. BANKR. L. J. 181, 206 (1991). In short, the opinions in other jurisdictions turn on their facts. Here, the circuit court examined the surrounding facts and circumstances as well as the critical criteria discussed above and concluded that the transactions were *bona fide* sales, not loans. We will discuss each of the critical criteria gleaned from foreign jurisdictions *seriatim*.

### (ii) Control

Mr. Carter and Commerce Alliance first argue that unlike a typical factoring agreement, they had no control over when the government agency would pay a purchase order on an account receivable that had been factored to Four Seasons. They urge that this fact, combined with the fact that the discount fee under the factoring agreement grew larger over time, makes the fees equivalent to interest, thus pointing toward the existence of a loan, not a sale.

Four Seasons replies that Commerce Alliance had full control over when the purchase order would be paid. If Commerce Alliance performed its obligations to its customers in accordance with

the contracts it negotiated with them, Four Seasons emphasizes, then the government agency would pay. The contracts that the government agencies made with Commerce Alliance's customers specified delivery times, and the contracts that Commerce Alliance negotiated with its customers stated that Commerce Alliance would send the invoice to the government agency leading to payment of the purchase orders. Thus, Four Seasons concludes, Commerce Alliance was in control of when the goods were delivered to the government agency and when the payment would be sent.

█ The circuit court was persuaded by Four Seasons's argument, and we conclude that this conclusion was not clearly erroneous. Based on the structure of the transaction in question, it is clear that even if Commerce Alliance did not have absolute control over the timing of the payment from the government agency, it had more control than did Four Seasons. Under the arrangement, Four Seasons could not even notify the government agency that it was the owner of the account in question, much less dictate to the government agency when to pay. The control factor, in sum, does not weigh in the appellants' favor.

### (iii) Recourse

█ The existence of recourse against Commerce Alliance is claimed by the appellants as perhaps the single most important factor in determining whether the transaction was a legitimate factoring arrangement or a loan. One article has described the recourse issue in these terms:

> In several decisions courts have considered recourse to the seller for nonpayment of the transferred assets to be suggestive of a loan rather than a sale. This recourse can take the form of a repurchase obligation, a guarantee of collectability by the seller, a failure to extinguish or reduce an independent obligation for which an "absolute assignment" is made, or a hold back of reserves from the purchase price which are released to the seller only as receivables are paid.

Robert D. Aicher & William J. Fellerhoff, *supra* at 186. *Compare, e.g., Major's Furniture Mart, Inc. v. Castle Credit .Corp., Inc.,* 602

F.2d 538 (3d Cir. 1979) (holding that account sold with "full recourse" with a reserve from the purchase price held back to be applied to future nonpaying accounts and a requirement that the seller repurchase delinquent accounts after sixty days was a loan) with *In re Golden Plan of California*, 829 F.2d 705 (9th Cir. 1986) (holding that an assignment of mortgage notes and a deed of trust "without notice" and no guarantee of repayment was a bona fide sale.).

The appellants strongly contend that the Purchase Agreement establishes full recourse against Commerce Alliance in that the only exception is for bankruptcy, a condition that would not be applicable to the federal government. Further, they contend that a provision of the agreement is entitled "No Recourse to Seller," when in point of fact there is recourse for breach.

The circuit court concluded, nevertheless, that the provision for recourse against Commerce Alliance if the accounts were not paid in 90 days did not convert the arrangement into a loan. On this point, the court credited Christopher Barrier's expert testimony that it was commonplace to include recourse provisions in factor agreements and that recourse had a direct impact on the sales price. In Mr. Barrier's opinion, the extent of the recourse against the seller was an issue for negotiation between the parties.

We conclude that the circuit court was not clearly erroneous in finding that this recourse agreement did not convert the transactions into loans. Recourse arrangements appear to vary from contract to contract. In the case before us, recourse against Commerce Alliance was only triggered if the account did not exist or it proved uncollectable in 90 days. No recourse in this case occurred until the 90-day warranty was breached, but at that time, the parties agreed that there would be full recourse. No doubt, this resulted in a higher purchase price for the accounts receivable and, thus, more cash to Commerce Alliance. Such a circumstance does not indicate a sale rather than a loan.

■■ This court has discussed the concept of recourse in *Haley v. Greenhaw, supra,* and analyzed whether the existence of full recourse converted the factoring arrangement into a loan. We

consider the following quotation from *Haley* important to this issue, as did the circuit court:

> To so hold [that the transactions were usurious as a matter of law] would have the same effect as saying that a note bearing ten percent interest can never be sold at a discount unless the seller sells without recourse. Such a holding would of course, seriously curtail commerce, and would impair the negotiation and sale of commercial paper. Certainly, negotiable notes and mortgages are the subject of *bona fide* sales in the usual course of business, and very frequently their sales are at a discount. Probably, most often the sales are with recourse, for many business concerns would not purchase the paper otherwise. We see no reason why an actual and *bona fide* sale and purchase of paper at a discount should be hampered by the ruling that appellant seeks."

235 Ark. at 486, 360 S.W.2d at 756-757. We affirm once more the analysis in *Haley* and conclude that full recourse is not out-come-determinative for the issue raised in the instant case.

### (iv) Notice

 Mr. Carter also maintains that notice is a key fac-tor to be considered in determining whether an agreement is a loan or a sale. As one commentator has put it: "When the seller retains control over the collection of transferred receivables, the failure to notify account debtors of the transfer is likely to be viewed as a factor contrary to the characterization of the transac-tion as a sale." Reade H. Ryan, Jr., *Trade Receivables Purchases*, DS71 ALI-ABA 305, 373 (American Law Institute-American Bar Ass'n Continuing Legal Education 1999). The appellants argue that Four Seasons did not notify the government agencies of the sale of the accounts receivable, and in the one assignment when Four Seasons attempted to do so, it described itself as the "man-ager" of the account and not the owner operating under a factor-ing agreement.

Despite this contention, Mr. Carter testified that the parties discussed the notice issue and Four Seasons wanted to notify the government to pay it instead of Commerce Alliance. Indeed, a minor skirmish in this case was the attempt of Four Seasons, prior to the adoption of the Addendum, to give notice to the govern-ment agency.

Mr. Carter flared at the suggestion of notice, and instead proposed, as an alternative, that Four Seasons be given control of the Pulaski Bank account. This was done by the Addendum drafted by Mr. Carter. It is axiomatic that agreements are construed against the drafter. *See Yellow Cab of Texarkana v. Texarkana Mun. Airport*, 230 Ark. 401, 322 S.W.2d 688 (1959). The purpose of notice to the account debtor is to minimize the risk of nonpayment to the factor and assure that the account will be paid to it. In the instant case, the parties could not manage the risk in the traditional way but instead negotiated an alternative risk-managing scheme. Any lack of notice in this financial arrangement came about at Mr. Carter's insistence. Nor do we view the reference to "managing" in the one letter Four Seasons wrote to a government agency as indicative of loan intent. Absence of notice, accordingly, does not militate for a holding in the appellants' favor.

(v) Pricing Mechanism and Adequacy of Consideration

Mr. Carter and Commerce Alliance claim that when pricing is structured in a similar fashion to commercial loans, such as when it is based on a fluctuating interest index, the transaction is more likely to be characterized as a loan. Four Seasons answers that it did not employ a commercial fluctuating interest rate such as the prime rate and further that the price of the discount charge was fixed in advance by the discount schedule (3% per fifteen days), and was not retroactively calculated based on a changing interest rate in any respect.

Mr. Carter and Commerce Alliance advanced, in addition, the argument that under the agreements the discount percentage could be assessed against the purchase price without limit until the fees required disgorgement of part of the 65% of the sale price already advanced to Commerce Alliance and maybe more. They add that Four Seasons changed its argument before trial to purge its claim of usury.

It is true that Four Seasons attached an exhibit to its summary-judgment motion that included totals for discount fees on accounts that had accumulated for as many as 459 days. Yet, a witness for Four Seasons, Gregory Young, was steadfast at trial in testifying that Four Seasons was not seeking accumulated discount fees under its fifteen day formula but only the total of the face

amounts outstanding on the accounts. This is what Four Seasons initially claimed in its third-party complaint, and those amounts totalled $316,616.70. Though Four Seasons did calculate discount charges based on the total time for which the accounts were unpaid in an exhibit for summary judgment, it asked for the face amount of the accounts in its third-party complaint and in testimony at trial. We hold that the circuit court did not err in the damages awarded based on the face amount of the outstanding accounts.

### (vi) Intent

Mr. Carter claims that the parties consistently treated the transactions at issue as loans, and not as sales. He points again to the "manager" language in a letter written by Four Seasons to the government agency during Four Seasons's unsuccessful attempt to put the government on notice that it was the new owner of the accounts, and to the language of federal regulations involving contracting with the federal government that require a novation contract be given to the government in order to effect an assignment.

The circuit court credited the testimony of Four Seasons officers that the corporation did not make loans and that the officers treated the transactions at issue in this case as purchases both in their business accounting and tax returns. We cannot say that these factual findings were clearly erroneous. Nor can we conclude that the circuit court clearly erred in finding the absence of loan intent on the part of Four Seasons.

### (vii) *Milana*

As a final point, Mr. Carter's and Commerce Alliance's adducement to *Milana v. Credit Discount Co.*, 163 P.2d 869 (Calif. 1945) is not helpful to their case. The California Supreme Court found that the transactions in *Milana* were identifiable as loans on their face:

> From the evidence introduced by the plaintiff in the case at bar the trier of the facts could reasonably conclude that the contracts of the parties provided for a conditional transfer of title; that advances by the defendants were contemplated to be repaid within a specified time at a charge for the use of the money

which was deducted in advance; that the essence of the agreements was the use by the plaintiff of the funds at prescribed rates of interest which were in excess of the constitutional rate; that the transactions were not sales of accounts receivable but loans secured by assignments of the accounts at usurious rates of interest; *that the intent to accomplish such a result was discernible from the contracts themselves;* and that the negotiations and the conduct of the parties under the contracts further tended to dissipate any doubt arising from the employment of sales terminology. A finding on the plaintiff's case alone to the effect that the sale form was used merely as a cover for the real intent would find support from the written contracts, the conduct of the parties and the surrounding circumstances.

*Milana,* 163 P.2d at 872 (emphasis added). Moreover, as the circuit court noted, it is unclear whether *Milana* is still the law in California.

 In the case at hand, the primary agreement in dispute is entitled a "Purchase and Sale Agreement." Moreover, the terms of the agreement detail a sales transaction throughout — not a loan. The *Milana* decision is clearly distinguishable.

(viii) Conclusion

 The Purchase Agreement at issue was the result of negotiations between two sophisticated business entities. The terms of the agreement expressly contemplated the sale of accounts receivable at a discount — a common means of raising capital. Looking at the agreement itself and the actions of the parties, we discern no basis for a reversal of the circuit court on grounds that it clearly erred in finding that the parties agreed to a sale of accounts receivable. To us, it is clear that the parties intended a factoring agreement and an analysis of all relevant factors confirms our conclusion. Moreover, we agree with the circuit court that the appellants failed to meet their burden of proof by clear and convincing evidence that the financial arrangement was a subterfuge for usurious loans. To conclude as appellants would have us do under these facts would be to cast legal doubt on the business of factoring accounts receivable as a means of raising capital. This we are not inclined to do.

II: Security Interest in Non-factored Proceeds

Mr. Carter and Commerce Alliance next argue that even though Commerce Alliance may have breached the Purchase Agreement at some point, Four Seasons breached it first. He points to the fact that Four Seasons did this in September 1999, when it initially applied proceeds of non-factored accounts that would otherwise have been due to Commerce Alliance toward the collection of several delinquent factored accounts. If this appropriation of non-factored proceeds is classified as a material breach, the appellants argue, then Commerce Alliance's obligation to perform was discharged and its subsequent behavior excused.

The parties agree that the Purchase Agreement only dealt with the assignment of the accounts. However, the Addendum, the appellants point out, deals with non-factored accounts and specifies that Four Seasons agrees that it will "transmit the proceeds of the non-factored contracts to Commerce Alliance without a factor fee applied." Mr. Carter refers to his testimony that he negotiated this term of the Addendum to assure that he would be able to obtain the proceeds of non-factored accounts from the Pulaski Bank account even after he gave Four Seasons control over the account. He argues that since the Addendum affirmed that Four Seasons could not attach non-factored accounts, Four Seasons breached the contract when it did just that in September of 1999. He concludes that the circuit court erred in finding that Four Seasons's application of proceeds from non-factored accounts to delinquent factored accounts was not a breach. To read the agreements otherwise, he contends, nullifies the effect of the Addendum.

Four Seasons confronts this argument by underscoring that the parties contracted in the Purchase Agreement for Four Seasons to have a security interest in all of Commerce Alliance's accounts receivable in the event of a breach.[5] Four Seasons maintains that it merely followed the terms of that agreement by exercising its right to its security interest after it was unable to collect on the factored accounts within ninety days, as Mr. Carter had warranted it would

---

[5] The circuit court found that Four Seasons never applied a factor fee to a non-factored account in Pulaski Bank.

be. The Addendum, Four Seasons maintains, does not change the grant of the security interest in the Purchase Agreement. It merely reflects the parties' agreement about how the Pulaski Bank account would be managed.

The basic rules of contract interpretation are well known. *See Pickens-Bond. Constr. Co. v North Little Rock Elec. Co.*, 249 Ark. 389, 392, 459 S.W.2d 549, 552 (1970) ("In construing a contract, the courts must endeavor to give meaning and effect to every word. . . ."); *Bailey v. Whorton*, 207 Ark. 849, 853-854, 183 S.W.2d 52, 54 (1944) ("In construing a contract every sentence, clause and word therein should, when it can be reasonably done, be given effect."); *Miller v. Dyer*, 243 Ark. 981, 986, 423 S.W.2d 275, 278 (1968) ("A construction which entirely neutralizes one provision should not be adopted if the contract is susceptible of another which gives effect to all of its provisions.").

We disagree with the appellants' characterization of the two agreements. The subject of the Purchase Agreement was indeed the sale of accounts receivable. The Addendum, however, was negotiated as an alternative to giving notice to the government agencies that Four Seasons owned the accounts. Mr. Carter's compromise measure — giving control of the Pulaski Bank checking account to Four Seasons — took away his ability to take money out of the account without violating the agreement. That account, however, was where the price for all purchase orders on all accounts, factored or not, was paid. Under the Addendum, Four Seasons was required to remit the proceeds from non-factored accounts to Commerce Alliance. In short, the Addendum was simply a negotiated way for Commerce Alliance to receive the money from non-factored accounts without a discount fee after it turned control to the Pulaski Bank account over to Four Seasons. It did not change Four Seasons's security interest under the Purchase Agreement.

None of this changes, in our judgment, the fact that Commerce Alliance contracted to give Four Seasons a security interest in all of its accounts in the Purchase Agreement in the event that it breached the agreement regarding the factored accounts' collectability. Had Mr. Carter, who drafted the Addendum, intended to change the security interest in non-factored accounts,

it would have been an easy matter for him to have included such language in that agreement. But he did not.

■ The circuit court did not clearly err in finding that certain factored accounts were delinquent for longer than 90 days as of September 21, 1999. This compels the legal conclusion that Commerce Alliance was in breach of the warranty under the Purchase Agreement that accounts would be collectable within 90 days, which triggered Four Seasons's rights in its security. We conclude, as did the circuit court, that the language in the Addendum requiring Four Seasons to remit the proceeds of non-factored accounts in Pulaski Bank to Commerce Alliance did not alter Four Seasons's right to a security interest in the non-factored accounts in the event of breach. We affirm the circuit court on this point.

## III. Damages

The circuit court found that the damages due to Four Seasons's unpaid factored accounts totalled $316,616.70. The appellants, however, argue that this damage award is erroneous and that Four Seasons changed the damages that it was seeking just before trial in an attempt to purge the contract of usury. In any event, the appellants argue, the agreement does not entitle Four Seasons to the face value of the accounts receivable, because the purchase price as defined by the Purchase Agreement is calculated only on the discount fees.

■ We disagree. First, we have already concluded in this opinion that the Purchase Agreement was a sale of accounts, not a loan based on those accounts. But, in addition, the Purchase Agreement contemplates a sale of accounts that will be collectable in ninety days. The discount fee affects the amount of profit that Four Seasons realizes on a factoring transaction. But it does not change the fact that Four Seasons desired to collect the face value of purchased accounts under the agreement. Four Seasons emphasizes in its brief that, at some point, the amount of the initial payment (65% of the face value) plus the discount fee will equal the face value of the account. The full face value on outstanding accounts is all Four Seasons sought as damages. That was its objective from the beginning — to buy accounts receivable with a certain face value with a goal of collecting the full face

value of the accounts. The circuit court's finding on this point was not clearly erroneous.

## IV. Constructive Trust

For his final point, Mr. Carter argues that the circuit court mistakenly imposed a constructive trust on all funds in the Pulaski Bank account. The circuit court found that Four Seasons was entitled to equitable relief on the basis that Mr. Carter and his corporation blocked Four Seasons's access to the Pulaski Bank account. Mr. Carter and Commerce Alliance contend that a constructive trust is inappropriate, because Four Seasons has an adequate remedy at law, damages, and they cite this court to a court of appeals case, *Mitchell v. Mitchell*, 28 Ark. App. 295, 773 S.W.2d 853 (1989), in support of their contention.

■■ A constructive trust is an implied trust arising by operation of law to service equitable needs. *Betts v. Betts*, 326 Ark. 544, 932 S.W.2d 336 (1996). The fundamental purpose of a constructive trust is to prevent unjust enrichment. *Id.* This court has written:

> A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence or mistake, breach of a fiduciary duty, or wrongful disposition of another's property. The basis of the constructive trust is the unjust enrichment that would result if the person having the property were permitted to retain it. Ordinarily a constructive trust arises without regard to the intention of the person who transferred the property.

*Id.* at 547, 932 S.W.2d at 337-338 (quoting *Edwards v. Edwards*, 311 Ark. 339, 343-344, 843 S.W.2d 846, 849 (1991) (quoting *Scott on Trusts* § 404, 2 (1989)).

■ Because we agree that the financial arrangement between the parties was for a sale of accounts and not a loan on those receivables, a constructive trust was an appropriate remedy. In this regard, we cannot say that the circuit court's factual findings regarding the closing of Mr. Carter's businesses and his appropriation of funds that were paid to the account to satisfy factored

accounts are clearly erroneous. Under these facts, to the extent that Mr. Carter and Commerce Alliance wrongfully disposed of Four Seasons's property and will be unjustly enriched if he keeps the money, a constructive trust is an appropriate remedy to make sure he disgorges ill-gotten gains.

 The appellants cite one lone case in support of their position that a constructive trust is an inappropriate remedy, *Mitchell v. Mitchell, supra.* In *Mitchell,* the controversy involved an equitable lien, not a constructive trust. Apart from the fact that imposition of equitable liens and constructive trusts are governed by different legal principles, the *Mitchell* case clearly turned on its facts. For that reason and the fact that the decision is not binding precedent on this court, the case is not controlling authority. We hold that a constructive trust was the appropriate remedy under these facts, and we affirm the circuit court in this regard.

## V. Alternative Reasons to Affirm

Four Seasons argues estoppel, unclean hands, and lack of capacity to sue as alternative reasons to affirm the circuit court. We find it unnecessary to address the issues of estoppel or unclean hands. On the capacity issue, Four Seasons claims that Commerce Alliance no longer exists due to the revocation of its corporate charter and, thus, lacks the capacity to pursue this appeal.

Four Seasons did raise the capacity issue as one of several grounds for its motion for summary judgment, but the motion was denied without a specific ruling. Furthermore, this issue was not sufficiently developed at the trial-court level, either factually or legally. As a result, we do not know what date the charter was revoked, because there was no court finding on that point. Indeed, the parties conflict in their briefs on when Commerce Alliance's charter was forfeited. Four Seasons asserts this happened on December 31, 1999, while Mr. Carter asserts it occurred on December 31, 2000. Also, it is clear under our Tax Code that a revoked charter may be reinstated within seven years of the forfeiture date. *See* Ark. Code Ann. § 26-54-112(a)(B)(2) (Supp. 2001). The effect of this statute on the capacity issue was not discussed by Four Seasons.

We will not develop an issue for a party at the appellate level. *City of Benton v. Arkansas Soil and Water Conservation Com'n*, 345 Ark. 249, 45 S.W.3d 805 (2001); *Union Nat. Bank v. Barnhart*, 308 Ark. 190, 823 S.W.2d 878 (1992).

Affirmed.