Jon R. SANFORD  *v.*  Sherry W. SANFORD

02-789                                               137 S.W.3d 391

Supreme Court of Arkansas
Opinion delivered December 11, 2003

*Appellant, pro se.*

*Mitchell, Blackstock, Barnes, Wagoner, Ivers, and Sneddon,* by: *Jack Wagoner, III* and *Kimbery Miller,* for appellee.

TOM GLAZE, Justice. Appellant Jon R. Sanford and appellee Sherry W. Sanford had been married thirty-four years when they separated on October 22, 1996. During the following approximately eighteen months, Jon, an attorney, and Sherry, a housewife, spent some time arriving at a property settlement agreement. On May 5, 1998, Sherry filed for and was granted a divorce in Pulaski County, and, on the same date, she signed a property agreement, plus a separate trust agreement. The trust agreement named Sherry the settlor and Jon the trustee and co-owner of one-half interest in the parties' properties. Its expressed purpose was to vest in

Jon, Sherry's individual half interest in certain real estate she and Jon owned in Pope and Johnson Counties. The trust was to insure the properties would be prudently liquidated, giving Jon the authority to manage, develop, and sell the properties as he deemed best, without interference from Sherry. Jon had prepared these two agreements, as well as the complaint for divorce and the final decree that Sherry filed when she obtained the divorce. Jon did not contest the grounds for divorce, and because all fifteen of their children were over the age of eighteen, child support was not an issue.

On January 22, 2001, Sherry filed this litigation against Jon in Pope County, alleging that Jon had breached his fiduciary duty as trustee by having failed to manage the trust assets for the mutual benefit of the parties. Sherry's action was initiated as a result of Jon having failed to pay the capital gains tax arising from the sale of the parties' apartment complex, Oakwood Apartments. Sherry claimed Jon improperly chose to pay a personal loan obligation that Sherry allegedly owed him. Besides demanding her one-half share of the gross amount from the sale of the Oakwood Apartments so she could apply the proceeds toward payment of the capital gains tax, Sherry also sought a full accounting of all trust properties and proceeds. Jon denied Sherry's claim that he had breached any fiduciary duty to Sherry by preparing all of the parties' legal documents for their divorce. He rejoined that he did not give any advice to Sherry; therefore, he had no attorney-client relationship from which a conflict could result. As for Sherry's request for an accounting, Jon submitted that he had already provided one to her. A series of hearings followed.

On May 9, 2001, the Pope County Circuit Court concluded it had jurisdiction to enforce the parties' agreements, and, if appraisals were to be needed of their various properties, the court would reserve its ruling as to who would be liable for the costs. Jon argued that Sherry should pay the costs since she was the beneficiary of the trust.

The parties had a second hearing on August 28, 2001, when they argued and presented testimony bearing on the three following issues:

(1)  Whether Jon committed self dealing and a breach of fiduciary duty when he did not pay the capital gains tax on the $314,000

proceeds from the sale of the Oakwood Apartments, but instead applied those trust proceeds to pay a personal loan he claimed Sherry owed him.

(2)  Whether Jon would be required to provide Sherry a full accounting of the assets and liabilities of the trust.

(3)  Whether Jon would be required to continue to finance Sherry's purchase of a bed-and-breakfast business, as he was required to do under the couple's May 5, 1998, property settlement agreement.

At the August 28th hearing, both Jon and Sherry agreed that the capital gains issue was the more urgent issue to decide. Jon stated that Sherry owed him about $47,000, which he had loaned her at five percent interest to buy a business; as trustee, he reimbursed himself out of Sherry's share of the proceeds from the Oakwood Apartments.[1] Sherry testified that such reimbursement left her without any of those sale proceeds to pay her part of the capital gains tax. Jon called witness Mr. Bruce Garrett, a certified public accountant, who had been preparing the tax returns for the Sherry Sanford Trust. He testified that, even though Sherry was never given any of the sale proceeds, she still owed the capital gains tax under the Internal Revenue Service rules.

As for Jon's tax liability, Mr. Garrett testified that Jon had other property to purchase that could minimize his capital gains debt. Garrett also conceded that, in addition to Jon's fifty percent of the sale proceeds, Jon got thirty-three percent from Sherry's share "each month that went by since the trust agreement was entered." He added, "When Oakwood was sold, [Jon] got a little over four percent of that, and I believe it was because the trust agreement had something dealing with administrative expenses." Garrett said that, while the trust agreement provided the trustee would not charge a fee for his services as trustee or attorney, Garrett "guessed" Jon was being compensated for being both trustee and attorney. Garrett also gave an account of how he helped Jon file three versions of the accounting of expenses to be

---

[1]  At the August 28, 2001, hearing, the trial court and Jon's and Sherry's attorneys discussed whether the parties' properties were actually made a part of the trust. Jon argued it was not, but Jon conceded that the properties were to be "treated as if they were in the trust."

charged against Sherry, including one-half of the debts, taxes, and insurance.

Sherry also testified at the August 28th hearing that she never hired an attorney because Jon said that she could trust him and that a lawyer would be too expensive. She stated that Jon volunteered to prepare all the documents and that he never mentioned anything about a possible conflict of interest. Sherry thought Jon was her lawyer, and she said Jon told her she would "probably get less" if she hired her own attorney. Sherry further testified that Jon never informed her that their businesses and properties should have been valued at the time of their divorce. Sherry then declared that, while Jon claimed she owed him $47,000, she disagreed, stating he had loaned her $27,000, at five percent interest, which represented his share of the proceeds from the sale of their North Little Rock home. When Sherry asked Jon to explain how the loan was $47,000, she quoted him as saying, "It is what it is."

On cross-examination, Sherry conceded that she initially felt some sense of loyalty to Jon, and she chose not to get an attorney because Jon told her they could not afford one. She admitted that, based on what she knew at the time of signing the agreement, she believed the documents were satisfactory. Sherry said that it was not until the apartments were sold, and she first learned of the sale from their children, that Sherry claimed she could no longer trust Jon. As for the tax indebtedness that was in issue, she thought, at the time of signing the documents, she was to be obligated for the taxes for 1996 and 1997, and the taxes would total only between $3,000 to $4,000. Jon never mentioned or discussed capital gains taxes with Sherry.

At the conclusion of the August 28th hearing, the court and the parties turned their attention again to which one of them would be responsible for paying a master to prepare and furnish the court with an accounting. After considerable discussion, all agreed that Jon had the capacity to do a "real accounting," and Jon said he could do so in twenty days. The trial judge made it clear that he wanted to resolve who was responsible for the capital gains tax as quickly as possible, and, while he was not, as yet, removing Jon as trustee, he held that, while the case was to be continued for another hearing, Jon would not act as the trustee. The judge asked

Sherry's counsel to prepare an order summing up "what they had been talking about."[2]

On November 9, 2001, the third and final hearing was held. Sherry called her final witness, accountant Bert Batchelor. Batchelor testified that he prepared a cash flow summary for Oakwood Apartments, covering the time Jon managed them prior to sale. The information Batchelor used came from Jon, who set out every penny spent and received. Batchelor determined the net cash available for distribution was $25,475 and that amount went to Jon as payment on a debt Sherry owed him. Batchelor further averred that, based on a formula in the trust, Sherry should have received about 98% of the net cash in 1998 and 95% in 1999. Batchelor said that the distribution number changed each month and, basically, Jon was given compensation for managing the trust, which was contrary to the terms of the trust agreement. In addition, Batchelor pointed to the parties' property settlement agreement which provided that their real estate should be reduced to tenants in common with Jon given both possession and control over the properties and full responsibility for all debts, taxes, and insurance. Notwithstanding this language, these obligations were paid from the trust, which resulted in Sherry receiving a lot less of the sale proceeds to which she would have been entitled. Upon inquiry by the court, Batchelor agreed that, because Sherry transferred only her one-half interest into the trust, his accounting should only be for half the debts, taxes, and insurance. However, Batchelor told the judge that, in his opinion, some of the debts and taxes should not have been charged to the trust. Jon's counsel then cross-examined Batchelor, and Batchelor agreed that someone had to pay one-half of these expenses in the Oakwood account. However, Batchelor added that nothing in the accounting alerted him that Jon or Sherry ever attempted to capture the shortfall from the Oakwood Apartments. He also said that he would not be surprised to learn that Jon paid the shortfall out of his own pocket. In order for the court to determine what net cash was available for distribution for the years 1998 and 1999, Batchelor was thoroughly cross-examined as to what the terms "debts, taxes, and insurance"

---

[2] On October 15, 2001, Sherry's attorney submitted an order to the judge directing Jon to pay Sherry one-half of the gross sale proceeds from the sale of the Oakwood Apartments, but omitted other jointly owned properties; however, Jon objected. The trial court agreed with Jon and entered an order dated October 31, 2001, staying its October 15 order until the parties had presented their entire case.

included. At this stage of the trial, the court was trying to understand whether there should have been a distribution, instead of Jon paying himself the debt he claimed Sherry owed him.

Jon took the stand to give his version of what was intended by the parties' agreements, which he admittedly prepared. Jon explained that he was to service the mortgages, pay the ad valorem taxes, insurance payments, and maintenance on the properties, and, if there was a shortfall, it was his "responsibility to keep it up." Jon added that, when he used the phrase in the property agreement, "husband is given possession and control over the properties in Pope and Johnson Counties and will be responsible for all debts, taxes and insurance," he did not mean he was responsible for paying them. He also offered that, in 1998, there was a $6,100 shortfall on the sale of the Oakwood Apartments, but he paid that amount out of his pocket and never mentioned it to Sherry. Regarding the sale of the apartments, Jon argued that, if the court construed the property settlement agreement as Sherry urged, she would receive one-half of the sale price free and clear of any indebtedness, but that he did not have sufficient money to pay her such an amount.

Jon further attempted to explain that the trust document provided that he, as trustee, shall not charge a fee. He said, "I wasn't going to be charging a trustee's fee *in the sense* that it applied to the corpus no matter what happened." He stated that, to be honest, the fee language in the agreement, particularly paragraph 5, was poorly drafted.

Again, Jon conceded that Sherry had no attorney, but he indicated that she knew what the properties were worth. He further stated that he never put anything in writing advising Sherry to get an attorney,[3] nor did he explain that a conflict of interest might arise as a result of Jon's preparation of all of the legal documents. The trust, Jon said, was designed to give him control over the properties because they "could never agree on anything like that." He averred that he did not apprise Sherry with information "by design," and, consequently, she agreed that he could have exclusive management of the properties.

---

[3] See comment to Rule 1.8(a) and (b) which provides that, as a general principle, all transactions between client and lawyer should be fair and reasonable to the client, and in such transactions, a review by an independent counsel on behalf of the client is often advisable.

In his testimony, Jon pointed out that he had assumed payment of all the family debts, and that Sherry was to receive her half of the equity when their properties sold. He further claimed she was to pay him back with interest for the monies he loaned her, which he asserted was about $47,000. Jon admitted that he used Sherry's share of the proceeds on the sale of the properties to retire her personal debt to him.

To conclude Sherry's case, she offered rebuttal testimony and summary argument, first pointing out that Jon had charged things to her that improperly increased her debt to over $65,000; as a result, Jon's payment to himself of $26,123.35 could not simply be subtracted from the $65,000 to determine what she owed Jon. In addition to the alleged $65,000 debt that Jon claimed was owed, Sherry's attorney reiterated that Jon was still responsible for the capital gains taxes, which is the debt which precipitated this suit. Nonetheless, Jon continued to maintain that the total debt Sherry owed him was $46,541.91 and that she had paid all of that amount except $74.57.

In Sherry's rebuttal testimony, she said that she had assumed Jon would pay whatever was still owed on their properties, and that she would receive one-half of what was left after taxes and insurance. Sherry made it clear that Jon was truthful when he testified as to his understanding that he would pay the properties' mortgage debt and then pay her; she added that she "wasn't wanting any money that wasn't due [her]." Sherry related that Jon "was going to pay her half of the net."

When again addressing the capital gains taxes issue, Sherry said that she knew very little about them. On cross-examination, Sherry conceded she had not been coerced, but it was her understanding that Jon was making payments because he was responsible for the debts, taxes, and insurance, and she would get half of the "net." Sherry told the judge that she and Jon never discussed what "net" meant, but, on cross-examination, she stated that she assumed "net" meant the amount remaining after the mortgage and other debts, taxes, and insurance were paid. When asked on cross-examination about certain terms and expenses listed on one of the closing documents, Sherry denied knowing what these items meant. She finally concluded that she "did not know about that stuff," and that she did not know what was meant by the phrase in the document that Jon would be responsible for the debt, taxes, and insurance.

Sherry further testified that she had a college degree in literature, had never taken any accounting or law courses, and was unaware of what a closing statement or real estate or capital gains tax was before this lawsuit. She testified that she had to hire an attorney and accountant to calculate what she was due under the property settlement and trust agreements.

Following the foregoing three evidentiary hearings, the trial court entered a December 14, 2001, order and a judgment on January 7, 2002. The court held in Sherry's favor, finding that Jon owed Sherry a fiduciary duty as a result of his having acted as her attorney and as trustee of the trust Jon prepared and the parties executed.[4] The trial court awarded Sherry judgment in the amounts of $20,106 and $47,865 (totaling $67,971 net cash available for distribution in the years 1998 and 1999). These sums were computed by using a rather complicated formula set forth in paragraph 5 of the trust agreement, which provided payments to Jon for managing, liquidating, and distributing the proceeds generated from the property in the trust. Citing 12 George G. Bogert and George T. Bogert, *The Law of Trusts and Trustees* § 814 (2d rev.ed. 1981) and *Ellis v. Baker-Matthews Lumber Co.*, 157 Ark. 139, 248 S.W. 7 (1923), the trial court held that, as a matter of law, Jon, as trustee, could not legally discharge a personal loan that Sherry owed Jon from trust proceeds to which Sherry would be entitled as the trust beneficiary. The lower court based its decision on Jon's breach of fiduciary duty to Sherry by acting as her attorney, and having done so, Jon failed to bear his burden of proof to demonstrate that the transaction entered into by both parties was fair and equitable. Jon filed a timely appeal raising two points for reversal. He submits the trial court was clearly erroneous in finding Jon breached a fiduciary duty which caused entry of the $67,971 judgment and the order directing him to pay Sherry's capital gains taxes.[5]

■ Our standard of review is especially significant here because of the conflicting evidence or, at the least, the differing inferences the parties presented and argued when trying this case.

---

[4] Because Sherry and her accountant agreed that Sherry never expected to receive one-half of the gross proceeds from the sale of the Oakwood Apartments, the trial court never reinstated the October 15, 2001, order awarding her judgment for $314,000.

[5] Jon listed three points, but two of the three regard essentially the same issue: whether the trial court was wrong in holding Jon legally responsible for Sherry's capital gains tax.

First, this court reviews equity cases *de novo* and will not reverse a finding of fact by the trial judge unless it is clearly erroneous. *Murphy v. City of West Memphis*, 352 Ark. 315, 101 S.W.3d 221 (2003); and *Kelly v. Kelly*, 341 Ark. 596, 19 S.W.3d 1 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *O'Fallon v. O'Fallon*, 341 Ark. 138, 14 S.W.3d 506 (2000). We view the evidence in a light most favorable to the appellee, resolving all inferences in favor of the appellee. *Arkansas Transit Homes, Inc. v. Aetna Life & Cas.*, 341 Ark. 317, 16 S.W.3d 545 (2000). However, a trial court's conclusion on a question of law is given no deference on appeal. *Murphy v. City of West Memphis*, 352 Ark. 315, 101 S.W.3d 221 (2003); *Kelly, supra;* and *City of Lowell v. M & N Mobile Home Park, Inc.*, 323 Ark. 332, 916 S.W.2d 95 (1996).

Before turning to Jon's first argument, we note that, when this case was tried below, Jon denied having given advice to Sherry as an attorney. As a result, he claims there was no conflict of interest in drafting the documents for their divorce, nor did he undertake any fiduciary obligation to Sherry. On appeal, however, Jon begins his argument by admitting that, because he was an attorney and Sherry was not, a fiduciary relationship did exist between the two of them.[6] Jon also goes on to acknowledge that, as trustee, he also owed a fiduciary obligation to Sherry because she is the beneficiary of the trust. Nonetheless, he contends that, even if a fiduciary duty exists, Sherry was required to prove the questioned agreements resulted in an advantage to Jon, the dominant party in the relationship. Having conceded that he undertook a fiduciary obligation to Sherry, we now are required to review our well-settled case law regarding an attorney's and trustee's responsibilities when acting in these respective roles.

First, we consider the attorney/client relationship and the duties an attorney must perform where a fiduciary relation exists. In the case of *Chavis v. Martin*, 211 Ark. 80, 199 S.W.2d 598 (1947), this court, quoting Chief Justice Hart in *Baker v. Humphrey*,

---

[6] Jon concedes an attorney-client relationship exists between Sherry and Jon, but "none was intended."

101 U.S. 494 (1879), set out the duties and principles to which an attorney must comply when acting in a fiduciary relationship:

> A fiduciary relation exists between attorney and client, and the confidence which the relationship begets between the parties makes it necessary for the attorney to act in the utmost good faith. *He must not only not misrepresent any fact to his client, but there must be an entire absence of concealment or suppression of any facts within his knowledge which might influence the client, and the burden of establishing the fairness of the transaction is upon the attorney.* This rule is of universal application, and is recognized by all of the text-writers on the subject.

> \* \* \*

> Equity regards the relation of attorney and client much in the same light as that of guardian and ward, and will relieve a client from hard bargains, or from an undue advantage secured over him by his attorney. And *the client*, in order to secure such relief, *is not bound to show that there has been any imposition or fraud, nor is the transaction necessarily void; but if it is a transaction in which the relation between the parties exerted, or might reasonably exerted, any influence in the attorney's favor, then the burden of establishing its perfect fairness is thrown upon the attorney.*

*Id.* at 86-87, 199 S.W.2d at 602. (Emphasis added.)

In considering Jon's role as trustee in this case, again, the law appears well settled. This court, in *Riegler v. Riegler*, 262 Ark. 70, 553 S.W.2d 37 (1977), reviewed the following rules that guide a trustee when administering a trust:

> It is well settled that a trustee is held to a high standard of good faith and prudent dealing. He owes a duty of loyalty to the beneficiaries.

> \* \* \*

> In administering the trust, the trustee must act for the beneficiaries and not for himself in antagonism to the interest of the beneficiaries; he is prohibited from using the advantage of his position to gain any benefit for himself at the expense of the beneficiaries and from placing himself in any position where his self interest will, or may, conflict with his duties.

> \* \* \*

> Our cases hold that *beneficiaries may hold the trustee personally liable for a breach of trust.*

*Id.* at 76, 553 S.W.2d at 40. (Emphasis added.)

This court's decision in the earlier case of *Hardy v. Hardy*, 217 Ark. 296, 230 S.W.2d 6 (1950), is consistent with *Riegler* and states the following general rule:

> ... [T]he trustee must exercise skill, prudence and caution and that he represents and must protect the interest of all the beneficiaries and that he must act honestly and in utmost good faith. In administering the trust, the trustee must act for the beneficiaries and not for himself in antagonism to the interest of the beneficiaries; he is prohibited from using the advantage of his position to gain any benefit for himself at the expense of the beneficiaries and from placing himself in any position where his self interest will, or may, conflict with his duties.

*Hardy* at 301, 230 S.W.2d at 9.

Our review of the record leads us to one conclusion — the trial court was not clearly erroneous in deciding that Jon breached his fiduciary duty by acting as Sherry's attorney. Although Jon argues Sherry consented to his preparation of all the legal documents needed for their divorce and the liquidation of their properties, Sherry was clearly at a disadvantage. Sherry testified that she had expressed an interest in getting an attorney, but the reason she did not was because Jon told her that he could not afford one; she further averred that she had no money. Based on this and other testimony given by Sherry, the trial court determined that Jon exercised a superior, dominating influence over Sherry in business affairs. It is also bothersome that Jon admitted that he actually designed the trust to give him control over the properties because "he and she could never agree on anything like that." Jon recognized his legal responsibility when he finally acknowledged that, as an attorney, he owed Sherry a fiduciary duty. Jon's acts fell short of meeting his fiduciary obligation.

Many of the problems that arose after the two parties signed the legal instruments had to do with crucial items not clearly described in the property and trust documents. As already

discussed above, Jon indisputably failed to inform Sherry that she would have to pay capital gains tax when their properties were sold. She only learned of this rather significant problem after Jon sold the parties' largest asset, Oakwood Apartments, and when the Internal Revenue Service asked Sherry to pay her share of the taxes. Sherry testified that she thought she would be called on to pay only $3,000 to $4,000 in accrued taxes. However, Sherry stated that she thought Jon would pay all of the other taxes because the trust agreement provided he was responsible for the debts, taxes, and insurance, and then she would get half of the "net." However, this capital gains tax issue surfaced and became especially relevant because Jon took all of Sherry's proceeds from the sale of the apartments, and left her without funds to pay the capital gains tax. Jon questions the credibility of Sherry's testimony on this matter and asserts that he had provided her ample funds in their divorce settlement, but she used these monies for other things, not taxes. Of course, the parties' differing stories and views on why she could not pay the capital gains tax were ones for the trial court to weigh and decide, not this court on appeal. As for Jon's voiced opinion that the property settlement agreement was liberally lopsided in Sherry's favor, we will discuss this further hereinbelow.

Another important matter arose in the parties' transaction when Jon's and Sherry's experts and Jon, himself, testified in an attempt to give meaning to the phrase, "husband is given possession and control over the properties . . . and will be *responsible* for *all* debts, *taxes* and insurance." (Emphasis added.) Jon opined this wording did not mean he was responsible to pay the taxes; however, Sherry submits that it had such a meaning to her. In addition, Jon tried to explain the trust provision which provides that he, as trustee, would not charge a fee, but yet, another provision in the agreement established a formula under which he did receive compensation for managing and selling their properties. Jon passed this conflict off by saying the no-fee-charged provision was poorly drafted. In such circumstances, since Jon was the one who prepared the trust instrument, the provisions must be construed in Sherry's favor. *Carter v. Four Seasons Funding Corp.*, 351 Ark. 637, 97 S.W.3d 387 (2003).

From our review of the record and the inferences that the trial court gave the testimony of the parties and their experts, we cannot say the trial court's findings and holdings were clearly

against the preponderance of the evidence. This is especially true when we view the evidence, as we must do, in a light most favorable to Sherry.

In sum, we do not suggest Jon committed fraud when drafting all of the legal documents in issue here. Nevertheless, at the very least, the property and trust agreement and their terms were both sufficiently complex and confusing; even a knowledge-able and veteran attorney would have trouble explaining them. In fact, the experts, legal and accounting, exhibited such frustration when giving testimony and opinions during the three evidentiary hearings. As we have made clear already, Jon had a duty not to misrepresent any fact to Sherry, but there also must be an entire *absence* of concealment or suppression of any facts within his knowledge which might have influenced her. Here, as we dis-cussed, all relevant facts that should have been given and explained to Sherry were clearly not afforded her.

In conclusion, we address Jon's contention that he has posited throughout his briefs that Sherry had the burden to show Jon had secured an advantage over her because she would have received less than she would have if their property and debts had been adjudicated by a judge in a contested divorce. Jon suggests there was not a scintilla of evidence that Sherry would have obtained a different result in a contested hearing concerning their property and debt issues.

While Jon may be personally satisfied that he had been more than generous with Sherry when he prepared the parties' agreements, he chose not to litigate the divorce and the property and spousal support issues, so what would have occurred in a contested divorce would be nothing but pure speculation. Nonetheless, Jon submits a comparison list that itemizes what each of them received when they executed their property settlement and trust agreements. That listing, he says, discloses his loan to Sherry of his share of the proceeds from the sale of their North Little Rock home. Sherry has since repaid that loan to Jon, along with five percent interest. He also states that he initially paid (covered) the parties' income taxes for the years 1996 and 1997, and Sherry was to repay Jon later from the sales of their jointly owned properties. She paid Jon that advance. Jon further reports that he agreed to take the unsecured family indebtedness totaling $86,000, and further agreed to pay $1,800 a month for four years,

so she could make payments on her bed and breakfast hotel purchase. The underlying reason for those monthly payments was to help her to relocate and try to find a source of income so that she could support herself, since she has largely spent her time after college being a housewife and tending to children. Of course, any award of alimony, temporary or permanent, is largely left to the discretion of the judge when such matters are contested. It is fair to point out certain factors a judge may consider when deciding alimony awards. Here, the evidence reflects that Sherry assisted financially and otherwise so that Jon could obtain his college degree; she and Jon were married approximately thirty-four years, and, during that period, she served as a housewife and caretaker for fifteen children. Jon was obviously the one who earned most of the family income, and his last reported annual income was $100,000. These are only a few factors that a judge, in his or her discretion, could use to award permanent alimony. If permanent alimony had been awarded in a contested divorce setting, Sherry could have exceeded the temporary monthly support Jon agreed to pay.

Jon further sets out a few other obligations he undertook by agreement, but while Sherry agreed to relinquish any claim she had in Jon's law firm, the record fails to reflect that he disclosed the value of his firm to her. Without such information, it is impossible to accept Jon's premise that it was Sherry who benefitted from their transactions. In short, Jon's claim that Sherry did not show that she had been disadvantaged by their agreements cannot be presumed by speculating what might have happened if they had gone to court.

For the reasons set out above, we affirm.[7]

BROWN and IMBER, JJ., dissent.

ANNABELLE CLINTON IMBER, Justice, dissenting.I believe this court lacks jurisdiction to consider the instant appeal. It is axiomatic in Arkansas law that an appeal may only be taken from a final judgment. Ark. R. App. P.—Civ. 2(a) (2003); *Farm Bureau*

---

[7] The dissent chooses to side step reaching the parties' arguments by suggesting the case should be dismissed under Ark. R. Civ. P. 54(b) (2003). However, the dissent fails to set out any issues left to decide. In fact, the only issues not decided were four issues merely mentioned at the end of Jon's brief where he simply said that he was precluded from developing them because of page limitations. Otherwise, those issues could have been ruled on, but were not since those points were without citation of authority or argument.

*Mut. Ins. Co. of Arkansas, Inc. v. Running M Farms, Inc.*, 348 Ark. 313, 72 S.W.3d 502 (2002). A final judgment is one that dismisses the parties from the court, discharges them from the action, or concludes their rights to the subject matter in controversy. *Fisher v. Chavers,* 351 Ark. 318, 92 S.W.3d 30 (2002). Nonetheless, the Arkansas Rules of Civil Procedure provide a method for a trial court to certify a judgment that does not dispose all parties or claims as final for appeal purposes. *See* Ark. R. Civ. P. 54(b) (2003).

This case was submitted to the court pursuant to Rule 54(b) of the Arkansas Rules of Civil Procedure that allows a trial court to "direct the entry of a final judgment as to one or more but fewer that all of the claims or.parties only upon an express determination, supported by specific factual findings, that there is no just reason for delay and upon an express direction for the entry of judgment." Ark. R. Civ. P. 54(b) (2003). Compliance with Rule 54(b) is jurisdictional, and this court is obliged to raise the issue even if parties to the appeal do not. *Moses v. Hanna's Candle Co.,* 303 Ark. 101, 110 S.W.3d 725 (2003).

To satisfy the mandates of Rule 54(b), the trial court must execute the following certificate:

<u>Rule 54(b) Certificate</u>

With respect to the issues determined by the above judgment, the court finds:

[Set forth specific factual findings.]

Upon the basis of the foregoing factual findings, the court hereby certifies, in accordance with Rule 54(b)(1), Ark.R.Civ.P., that it has determined that there is no just reason for delay of the entry of a final judgment and that the court has and does hereby direct that the judgment shall be a final judgment for all purposes.

Certified this ___ day of _____, ___.

_____
Judge

*See* Ark. R. Civ. P. 54(b)(1) (2003). We have previously held that an appeal taken from a judgment without the proper certification from the trial court will be dismissed without prejudice for lack of jurisdic-

tion. *City of Corning v. Cochran*, 350 Ark. 12, 84 S.W.3d 439 (2002). Moreover, the trial court's determination that there is "no just reason for delay" must factually set forth reasons explaining why a hardship or injustice would result if an appeal is not permitted. *See* Ark. R. Civ P. 54(b) (2003); *Franklin v. Osca, Inc.*, 308 Ark. 409, 825 S.W.2d 812 (1992).

In the instant case, the trial court made its 54(b) certification in the January 7, 2002 order as follows:

> The Court finds that the matters adjudicated through the Order and Judgment set forth hereinabove shall constitute a final order of this Court. The Court finds that, pursuant to A.R.C.P. 54(b), there is no just reason for delay and that judgment for the amount set forth in Paragraph 4 is directed to be entered through the immediate filing of this Order and Judgment of record.

The trial court neither issued the proper certificate nor set forth factual findings in support of its decision to certify pursuant to rule 54(b). The trial court's attempt to certify this order pursuant to Rule 54(b) is fatally flawed. *See, e.g., Bank of Arkansas, N.A. v. First Union Nat'l Bank*, 342 Ark. 705, 30 S.W.3d 110, (2000) (explaining that merely tracking the language of Rule 54(b) is insufficient).

Counsel in fact recognized the obvious deficiency in the order's 54(b) certification, and submitted a proposed order to the trial court with the following certificate:

### Rule 54(b) Certificate

> With respect to the issues determined by the above judgment, the court finds:

> A. That the determinations by this Court that are confirmed by this order are all of the principal issues that exist at this time. There may be other properties or issues to be determined at a later date, but such property or other issues will be determined based on the rule enunciated by the Court in this Order. The Court may be call upon to determine those other property and other issues at a later date, however, as of the date hereof, the principal issues are determined, and there is no just reason for delay of the entry of the final judgment.

Upon the basis of the foregoing factual findings, the court hereby certifies, in accordance with Rule 54(b)(1), Ark.R.Civ.P., that it has determined that there is no just reason for delay of the entry of a final judgment and that the court has and does hereby direct that the judgment shall be a final judgment for all purposes.

Certified this ___ day of January, 2002.

_____
Judge Lawrence Dawson

Date: _____

The trial court, however, refused to issue a corrected order; instead, the court concluded in a letter sent to counsel that "[t]he order of January 2, 2002, [filed January 7, 2002] is an appealable order." I believe that the trial court's determination that its 54(b) certification complied with the rule is clearly erroneous.

Absent the required certification, the action is not terminated and the trial court's order is subject to revision at any time before entry of judgment adjudicating all the claims and the rights and liabilities of all of the parties. Ark. R. Civ. P. 54(b)(2) (2003). Without a proper Rule 54(b) certification, this court lacks jurisdiction to entertain this appeal. *Moses v. Hanna's Candle Co.,* 353 Ark. 101, 110 S.W.3d 725 (2003). Because I would dismiss the appeal for want of jurisdiction, I must respectfully dissent.

BROWN, J., joins.