# SUPREME COURT OF ARKANSAS

No. CV–13–244

| | | |
|---|---|---|
| RANDY RUSSELL | | **Opinion Delivered** October 3, 2013 |
| | APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT |
| V. | | [NO. DR–2006–877 (III)] |
| ANDREA RUSSELL | | HONORABLE JIM SPEARS, JUDGE |
| | APPELLEE | <u>AFFIRMED; COURT OF APPEALS OPINION VACATED.</u> |

**JOSEPHINE LINKER HART, Associate Justice**

Randy Russell appeals from a divorce decree and the denial of his motion for a new trial. On appeal he argues that (1) the divorce decree was unlawful because it ordered him to buy at their inferential value corporate shares from his ex-wife, appellee Andrea Russell, instead of simply distributing existing marital property and (2) Andrea offered no competent evidence to prove that the business, National Recovery Specialists, Inc. (NRS), had a fair-market value independent of the personal goodwill of Glynn Colquitt, Randy's stepfather. We granted review after a unanimous court of appeals decision that affirmed this case as modified. *Russell v. Russell*, 2013 Ark. App. 151, ___ S.W.3d ____. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *Payne v. Ark. Dep't of Human Servs.*, 2013 Ark. 284.

Randy and Andrea were married in July 1996, and they separated in July 2006. No children were born of this union. Randy filed for divorce on August 29, 2006, alleging

general indignities. Andrea counterclaimed on October 23, 2006, alleging the same grounds.

In November 1996, Randy and his two step-brothers, Rod Colquitt and Ron Colquitt, each bought 33% of the shares in American Lenders Services Company, Inc. (A.L.S.C.O.F.S.), from Randy's stepfather, Glynn Colquitt. According to Randy, he used his stepfather's money to purchase his shares for $80,000. Later, the company became National Recovery Specialists, Inc. (NRS). The parties stipulated that Randy owned a 99/300th interest in A.L.S.C.O.F.S., Inc., and NRS. They also entered into a property-division agreement regarding all property except Randy's interest in NRS, which was decided by the circuit court.

NRS operates as a nationwide broker that engages independent contractors to repossess collateral. NRS has a single client, the Hong Kong Shanghai Banking Corporation (HSBC). Formerly, NRS had as its principal client Household Bank, which has since been acquired by HSBC. During the pendency of the parties' divorce action, HSBC was in the process of being acquired by Capital One. Although Glenn Colquitt sold his shares in NRS to his sons, he remained the face of the business and continued to draw a salary.

It was not disputed that the owners of NRS, Randy and his two stepbrothers Colquitt, freely took cash from the business over and above their salaries. These shareholders took over $2.9 million from the business over a three-year period from 2007 to 2009, to support their hobbies and other personal activities. Randy himself gave more



than $45,000 worth of gifts to his girlfriend.

Both parties hired experts to provide the circuit court with opinions about the value of Randy's shares in NRS. Both experts agreed that the full value of NRS was $3.028 million. However, their opinions as to what Andrea could realize from a sale of NRS stock varied widely.

In a pretrial deposition, Andrea's expert, Joe Webb, a certified public accountant, stated that he calculated NRS's value as of December 31, 2010. Although he asserted that his efforts were not intended to be relied on by anyone other than his client and him, he noted that if he were to do a valuation of NRS, he would discuss general economic conditions, industry-specific risks as well as company-specific risks, a standard value for the shares, and goodwill. According to Webb, he had great difficulty securing records and other information from NRS. He noted that he had not done a valuation because he could not agree with Andrea on the values to be used. However, in his calculation, he dropped the Mergerstat average control premium of 29.6% to 10% because Randy appeared to have some control over cash flow. Webb, conceded, however, that a buyer of 16.67% of NRS's shares would not expect that control of cash flow would follow their purchase, which could support a discount in the value of 50%. He applied a 5% marketability discount, but acknowledged that a buyer would likely look for a more substantial discount, between 30% and 40%. Webb admitted that the discounts he chose did not conform with industry standards.

At trial, Webb testified that he discounted the value of NRS by 10%. He eschewed

the average Mergerstat[1] value because evidence that all three of the shareholders had taken money out of the company indicated that they had "control." Further, he did not apply a separate marketability discount, though he acknowledged that the average marketability discount would be 35%. According to Webb, marketability and lack of control are closely related concepts. He further discounted the value by 6%, which took into account the possible sale of HSBC to Capital One. Finally, he attributed no "personal goodwill" to the value of NRS because Glynn Colquitt was not the owner of the business.

Randy's expert is Certified Public Accountant David Potts. Potts testified at trial that he prepared a fair-market valuation of 33% of NRS, which complied with all industry standards. Of the three possible "approaches" to valuation—income, asset, and market—Potts found the income approach to be the most valid. He rejected asset valuation because it worked best for companies that had ceased to operate and NRS was very much still in business. Likewise, he eschewed the market approach because it depended on comparable sales of companies, and he lacked sufficient data. Using the income approach, Potts valued NRS at $3,028,000, a figure that Webb endorsed. Accordingly, a 33% interest was worth $1,008,324. Potts then applied a 30% discount for lack of control and a 35% discount for lack of marketability, which reduced the value of Randy's shares in NRS to $458,787. He then discounted the goodwill of the business, opining that half of the goodwill was enterprise goodwill and the other half was the personal goodwill of Glynn

---

[1]Mergerstat compiles data regarding publicly announced mergers, acquisitions and divestitures involving 10% or more of the equity interests in public companies. It is also the publisher of statistical discounts commonly used in business valuations.

Colquitt, although he acknowledged that the personal goodwill could be substantially higher. In calculating the importance of Glynn Colquitt's personal goodwill, Potts spoke with James Priester of HSBC who assured him that HSBC would follow Glynn Colquitt if he were to open a competing business. Potts noted that there were no noncompete agreements in place. After the goodwill discount, Webb believed that half of Randy's stock would be worth no more than $115,000. In making his valuation, Webb noted that he assumed Glynn Colquitt would stay with NRS.

Andrea, who had been employed at NRS, testified that the company's continued viability was based not only on its personal relationships, but also on its ability to quickly comply with the changing requirements of HSBC. According to Andrea, compliance with HSBC requirements outweighed the personal relationships.

In its December 8, 2011 divorce decree, the circuit court found that Randy owned a 99/300th interest in NRS. It accepted the parties' agreed-upon value of $3,028,000, and after considering all the testimony, which included considerable information about how to discount goodwill, placed a value of $272,875 on Andrea's interest in the business. The circuit court then awarded that entire 33% interest in NRS to Randy and offset the "unequal division of property" by awarding alimony to Andrea in the amount of $11,370 per month for a period of twenty-four months, a sum that upon full payment was approximately equal to the value of Andrea's interest in NRS that was set by the circuit court .

Randy filed a timely motion for new trial on December 22, 2011, asserting two

SLIP OPINION

grounds. First, he argued that the decree was contrary to law because it obligated him to pay $272,880 "alimony in gross" for the "goodwill" value of property even though the "goodwill" belonged "neither to the marital business, nor to Randy Russell, but instead belonged to Glynn Colquitt." Second, Randy claimed that the circuit court erred in awarding alimony where there was neither evidence of Andrea's needs nor of his ability to pay. The motion was not acted on by the circuit court and was deemed denied on January 21, 2012. Randy filed a timely notice of appeal on February 1, 2012.

This court reviews equity cases de novo, but we will not reverse a finding of fact by the trial judge unless it is clearly erroneous. *Sanford v. Sanford*, 355 Ark. 274, 137 S.W.3d 391 (2003). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. *Id*. We, however, give no deference to a trial court's conclusion on a question of law.

On appeal, Randy first argues that the circuit court entered an "unlawful decree" because it ordered him to buy from Andrea corporate shares in NRS at their inferential value, instead of simply distributing existing marital property. Citing Arkansas Code Annotated section 9–12–315(a)(4) (Repl. 2009), Randy asserts that the circuit court was limited to either dividing the shares of NRS "in kind" or awarding the shares to one party on the condition that the fair-market value of those shares be distributed to the other party out of "then existing" property from the marital estate. Without further citation of authority, Randy argues that the statute "does not empower a court to issue a money

6

judgment or otherwise create a new debt for one party to pay in the future, when he does not otherwise own property sufficient to meet the amount to be paid." Randy also contends that the value that the circuit court assigned to the shares was improper because they were "non-marketable." He asserts that the circuit court's order compelling him to make a "forced buy" was even more improper than the "forced sale" that was proscribed by *Hodges v. Hodges*, 27 Ark. App. 250, 770 S.W.2d 164 (1989).

We agree that the distribution of marital property is guided by section 9-12-315, and that subsection (a)(4) speaks directly to the distribution of stocks, bonds, and other securities:

> When stocks, bonds, or other securities issued by a corporation, association, or government entity make up part of the marital property, the court shall designate in its final order or judgment the specific property in securities to which each party is entitled, or after determining the fair market value of the securities, may order and adjudge that the securities be distributed to one (1) party on condition that one-half ( ½ ) the fair market value of the securities in money or other property be set aside and distributed to the other party in lieu of division and distribution of the securities.

However, this statute does not bind the hands of a circuit judge when he is tasked with crafting an equitable division of marital assets. We have long recognized that circuit courts, in traditional equity cases, have broad powers to distribute the property in order to achieve an equitable division. *Williford v. Williford*, 280 Ark. 71, 655 S.W.2d 398 (1983). Toward that end, the circuit court may order credits and setoffs to achieve a just result. *See Marshall v. Marshall*, 285 Ark. 426, 688 S.W.2d 279 (1985). Additionally, we have held that the division of marital property and the award of alimony were complementary devices that a circuit judge may employ to make the dissolution of a marriage as equitable as possible. *Harvey v. Harvey*, 298 Ark. 308, 766 S.W.2d 935 (1989). *See Boyles v. Boyles*, 268 Ark. 120,

7

594 S.W.2d 17 (1980); *Ferguson v. Ferguson*, 251 Ark. 585, 473 S.W.2d 869 (1971). An award of alimony lies within the discretion of the circuit judge sitting in a traditional equity case and will not be reversed absent an abuse of that discretion. *Burns v. Burns*, 312 Ark. 61, 847 S.W.2d 23 (1993).

We agree, that as a general proposition, the primary consideration in a decision to award alimony is the needs of the payee spouse and the payor spouse's ability to pay. *Mulling v. Mulling*, 323 Ark. 88, 912 S.W.2d 934 (1996). However, it is not the only consideration, particularly when a circuit court awards temporary alimony. In the case before us, we are reviewing an award of *temporary* alimony. The this court noted in *Webb v. Webb*, 262 Ark. 461, 557 S.W.2d 878 (1977), and *Beasley v. Beasley*, 247 Ark. 338, 445 S.W.2d 500 (1969), we have long recognized that short–term award of alimony may be used as a method of allocating to one party an interest in the other party's property to balance some inequity in the division of marital property. That is exactly the situation that we have before us.

Contrary to assertions by Randy in his argument on appeal, it was not disputed that NRS was a ready source of income for the three principal shareholders who were able to withdraw large sums of money from the company. Indeed, the circuit court made a specific finding in the decree that equitable owners of NRS "have consistently lived out of the business drawing large sums to fund their hobbies and love life."

Under the unique facts of this case, we cannot say that the circuit court erred in ordering Randy to pay alimony as a complementary device to offset the unequal distribution

8

of marital property. It is not an abuse of discretion to make an award of alimony that is reasonable under the circumstances. *Mulling*, *supra* (citing *Harvey v. Harvey*, 295 Ark. 102, 747 S.W.2d 89 (1988)).

Further, we hold that the valuation of the NRS shares was not clearly contrary to the preponderance of the evidence. As noted previously, both sides presented expert testimony regarding the value of the business, and Andrea testified that NRS's performance with regard to changing bank directives and policies was more important than Glynn Colquitt's personal relationships. Randy himself acknowledges that the testimony of Andrea's expert, Joe Webb, would have supported a much higher valuation of the NRS stock. In our review, we defer to the superior position of the circuit judge to determine the credibility of witnesses and the weight to be given their testimony. *Roberts v. Yang*, 2010 Ark. 55, 370 S.W.3d 170. Under our standard of review, we cannot say that the circuit court clearly erred in determining the value of the NRS stock. Finally, we do not subscribe to Randy's contention that the award of alimony was in actuality a "forced buy" of stock. The award of alimony and the division of marital property, in whatever form the latter takes, be it an in-kind distribution or providing an equivalent to the property in cash, are not the same thing. Here, Randy received an interest in a business that was valued at approximately four times the amount that Andrea was entitled to as her share of this marital asset.

The balance of Randy's argument concerns the personal goodwill of Glynn Colquitt. Because his second point on appeal overlaps with the balance of his argument under his first point, for clarity, we consider it together. Randy first asserts that Glynn Colquitt's personal

goodwill is not marital property and that "all the value of NRS lies in goodwill." Citing *Holaway v. Holaway*, 70 Ark. App. 240, 16 S.W.3d 302 (2000) (citing *Belanger v. Belanger*, 276 Ark. 522, 637 S.W.2d 557 (1982)), he further argues that Arkansas appellate courts have twice held that it was improper to award alimony for the purpose of equalizing a division of marital property if the payor spouse does not at the time own the assets being distributed to him. Accordingly, the trial court erred because it awarded to Andrea the value of NRS when all the value was attributable to Glynn Colquitt's personal goodwill. Randy further argues, calling it a separate point, that Andrea offered no competent evidence to prove that the business, NRS, had a fair-market value independent of the personal goodwill of Glynn Colquitt. We find these arguments unpersuasive.

The cases cited by Randy are distinguishable. Both *Belanger* and *Holaway* involve a trial court's attempt to award an ex-spouse nonmarital property. We are mindful that, in the case before us, all the testimony concerning the value of NRS's stock acknowledged that some of the $3.028 million valuation was attributable to Glynn Colquitt's continued participation in the business. However, even Randy's expert, David Potts, testified that Jim Priester, the person at HSBC who decided whether NRS would get assignments, stated that if Glynn Colquitt opened a competing business across the street, he would "follow him," did not opine that all the value of NRS was attributable to Glynn Colquitt's personal goodwill. Potts provided an opinion of the fair-market value of the NRS stock that discounted the value of Glynn Colquitt's personal goodwill. Likewise, Andrea's expert, Joe Webb, provided an opinion of how to discount the value of Glynn Colquitt's personal

goodwill. Andrea also provided an opinion concerning the importance of Glynn Colquitt's continued participation in the business. Thus, the trial court was left with a substantial amount of evidence, albeit conflicting, by which it could determine how Glenn Colquitt's personal goodwill was to be valued. As we noted previously, we give due deference to the superior position of the circuit judge to assess the credibility of the witnesses and the weight to be afforded their testimony. *Roberts v. Yang, supra.*

Finally, Randy's contention that Andrea presented "no competent evidence" that NRS had a fair-market value independent of Glynn Colquitt's personal goodwill is simply not supported by the record. Andrea notes, and we agree, that her own testimony provided evidence of NRS value independent of Glynn Colquitt's personal goodwill. While she did acknowledge the value of Glynn Colquitt's personal relationships, she stated, as a former employee, that NRS continued to succeed in its business because of its ability to quickly adapt to the changing requirements of its principal customer.

Affirmed; court of appeals opinion vacated.

DANIELSON, J., concurs.

**PAUL E. DANIELSON, Justice, concurring.** I agree that the circuit court's award of payments to Andrea Russell should be affirmed; however, I take issue with the majority opinion failing to properly characterize these payments. Clearly, they are not "alimony" in the traditional sense as it has long been established that "an award of alimony in fixed installments for a specified period is prima facie erroneous as being an award of a gross sum instead of a continuing allowance." *Webb v. Webb*, 262 Ark. 461, 462, 557 S.W.2d 878, 879

(1977) (citing *Beasley v. Beasley*, 247 Ark. 338, 445 S.W.2d 500 (1969); *McIlroy v. McIlroy*, 191 Ark. 45, 83 S.W.2d 550 (1935); *Walker v. Walker*, 147 Ark. 376, 227 S.W. 762 (1921); *Brown v. Brown*, 38 Ark. 324 (1881)). However, this court has acknowledged that, depending on the facts of a particular case, such a short-term award may be a proper method of allocating to the wife an interest in her husband's property. *See id.* In the instant case, the circuit court used its discretion to do just that. However, it should not be confused with, nor subjected to the primary considerations given to, an award of alimony.

*Smith, Cohen & Horan, PLC*, by: *Matthew T. Horan*, for appellant.

*Gean, Gean & Gean*, by: *David Charles Gean*, for appellee.