Cite as 2024 Ark. 164

# SUPREME COURT OF ARKANSAS

**No.** CV-22-495

| | | |
|---|---|---|
| DAVID HEILEMAN | | **Opinion Delivered:** October 31, 2024 |
| | APPELLANT | APPEAL FROM THE POINSETT COUNTY CIRCUIT COURT [NO. 56DR-17-53] |
| V. | | |
| ARIEL CAHOON | | HONORABLE MARY LILE BROADAWAY, JUDGE |
| | APPELLEE | <u>REVERSED AND REMANDED; COURT OF APPEALS OPINION VACATED</u>. |

**CODY HILAND, Associate Justice**

David Heileman appeals from the Poinsett County Circuit Court's order granting Ariel Cahoon's petition for contempt and modification of the custodial arrangement. For reversal, Heileman argues the circuit court erred in modifying the custodial schedule and that a preponderance of the evidence failed to support a finding of contempt. Because the circuit court failed to make the material-change finding necessary to justify a modification of joint custody, we reverse and remand for further proceedings.

## I. *Factual Background*

In August 2017, Heileman and Cahoon were divorced by decree wherein their executed "Stipulation and Property, Child Custody and Support Agreement" was merged and incorporated. Per the agreement, the parties "shall have <u>joint custody</u> of [Minor Child

1 (MC1) and Minor Child 2 (MC2)],[1] with [Cahoon] having primary custody and [Heileman] having secondary custody."[2] Regarding the custodial schedule, the parties' time was divided as follows: During the school year, Cahoon would have the children Monday and Thursday nights, and Heileman would have the children Tuesday and Wednesday nights, with each parent enjoying alternating weekends. In the summers, the parties agreed to one week on, one week off. Overall, this split allowed the parties virtually an equal division of time with their children.

Almost four years later, in August 2021, Cahoon filed a "Petition for Contempt and for Other Relief, Including a Modification of the Custodial Arrangement Between the Parties" wherein she asked the court to "modify the prior orders of the court to grant [Cahoon] full custody of the minor children." Specifically, Cahoon's Petition stated, in pertinent part, the following:

> Since the entry of the Decree, there's been a substantial and material change in circumstances which compels this court to modify the custodial arrangement between the parties. These include but are not limited to the following: [Heileman] is working and living primarily out of State (Kentucky), and is not able to exercise the custodial time he was awarded; even during the time he is in the area, the "back and forth" has been and will continue to be detrimental to the children; and [Heileman] is unable to support the minor children as evidenced by his failure to pay child support as was ordered by the Court.

---

[1]At the time of the original agreement, MC1 was two years old and MC2 was one year old. At the time of the subsequent order on modification, MC1 was almost seven years old and MC2 was five years old.

[2]Despite the distinct titles of "primary" custodian versus "secondary" custodian, the parties shared true joint *legal* and *physical* custody. "Legal custody" is defined as the authority to make significant decisions on the child's behalf, including decisions about education, religious training, and healthcare. *Black's Law Dictionary* 484 (12th ed. 2024). "Physical custody" is defined as the right to have the child live with the person awarded custody by the court. *Id*.

The circuit court held a hearing in which both Cahoon and Heileman testified. In Cahoon's opening statement, she asked the court "that the joint custodial language be changed to full custody, on Ms. Cahoon's part, and to visitation, on the part of Mr. Heileman." When asked about the current custodial arrangement under which they operate, the parties both admitted to a deviation from their original agreement—instead of exercising their time as reflected in the order, they fluctuated on specific days that worked for the parties on a weekly or monthly basis, depending on their corresponding work or personal schedules.

When Cahoon was asked, "Have you . . . [tried to] work out any differences, on the *visitation*, for the well-being of [the] children?" she responded in the affirmative.[3] (Emphasis added.) To the extent she qualified her concerns with the current schedule, she justified her request for sole custody as follows:

> It was okay in the beginning. And then, as they get older, as schools change, and stuff like that. As, just, life changes, in general, you know, it just gets a lot on them, back and forth, and multiple houses, different rules. You know, it's hard, just, with the consistency and the stability. But we did the best, to make it work, as we could. It's just chaotic. They need to know when they're going somewhere, how long they're going to be somewhere, something along -- any -- so, it's just chaos. Nobody ever knows what's going on. I believe it has a lot of affect, with not knowing who's picking them up from school, how long they're going to be somewhere, with the schoolwork, you know, the consistency.

---

[3]"Visitation" has historically been defined as the noncustodial parent's period of access to the child. *See Black's Law Dictionary* 1889 (12th ed. 2024). Because Cahoon and Heileman shared joint physical custody, neither party actually exercised *true* visitation; they simply divided their parenting time.

Despite admitting the summer split worked well, Cahoon maintained her belief that "a week with Mom, a week with Dad" was not stable enough during the school year. When asked why she did not believe Heileman should have equal decision-making authority, Cahoon stated that decisions are always "a huge conversation, back and forth" but admitted that Heileman has not objected to any decisions about school, medical, or extracurricular activities. In fact, the children were healthy and doing well academically.

During Heileman's presentation of evidence, his new job as a traveling surgical technician was the focus. He testified that after cycling through several other jobs in an attempt to make his financial ends meet, he made the decision to onboard with the University of Kentucky for a higher and more consistent influx of income. The manager of the operating room, Christina Thomas, who is in charge of Heileman's work schedule, testified that he typically works "seven days on, five off, or eight days on, six days off" but that it "really depends on what his custody schedule was." According to Thomas, at the time Heileman signed his contract with the hospital, he made his priority known—"he wants to see his kids as much as he can, so he works as many hours, in the time that he is here, so that he can still keep his -- you know, his work -- what his contract states he works, but, also, meet the needs of his home life." She emphasized the hospital's willingness to accommodate his schedule and provide flexibility because they know Heileman lives in Arkansas to be near his children—which is why he was unwilling to move to Kentucky full time. Thomas admitted one full week on with the next full week off would not be an issue for Heileman's employment.

At the conclusion of the hearing, the circuit court took the matter under advisement before issuing a written order with the following findings:

> The Court finds that there has not been sufficient evidence to overcome the presumption of joint custody and therefore the joint custodial arrangement shall remain as is with the Defendant, Ariel Cahoon, remaining the primary physical custodian and the Plaintiff, David Heileman being the secondary custodian.
>
> The Court does find that there has been a change in circumstances sufficient to modify the parties' custodial schedule due to the Defendant's out of town work schedule and the fact that the children are now of school age. Due to the children's need for stability and consistency the parties' physical custodial schedule shall be as follows:
>
> During the school year, [Heileman] shall have his custodial periods with the minor children from Thursday afternoon when school recesses until Monday morning when school resumes on the second and fourth weekends of the month.
>
> After school recesses for the summer, the parties shall alternate weeks on a seven (7) days on, seven (7) days off basis.
>
> . . . .
>
> The Court further finds that [Heileman] is in contempt for his failure to pay child support in accordance with the Order of the Court. The parties must realize that once their agreements are reduced to a court order, then they are expected to comply therewith or seek court approval of any modification. The Court will defer any sentencing on the finding of contempt for ninety (90) days. [Heileman] may purge himself of the contempt by paying the balance of $17,540.01, which is $13,040.01 in back child support and $4,500.00 in back alimony.

Heileman timely appealed the circuit court's order, and the court of appeals affirmed. *Heileman v. Cahoon*, 2024 Ark. App. 72, 685 S.W.3d 256. Heileman petitioned this court for review, which we granted. When we grant a petition for review, we treat the appeal as if it had been originally filed in this court. *Russell v. Russell*, 2013 Ark. 372, 430 S.W.3d 15.

## II. *Custody*

## A. Standard of Review

In reviewing domestic-relations cases, this court considers the evidence de novo and will not reverse unless the circuit court's findings are clearly erroneous. *McNutt v. Yates*, 2013 Ark. 427, at 8, 430 S.W.3d 91, 97. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009).

The primary consideration in child-custody cases is the welfare and best interest of the children, and all other considerations are secondary. *Alphin v. Alphin*, 364 Ark. 332, 340, 219 S.W.3d 160, 165 (2005). "[C]ustody shall be awarded in such a way so as to assure the frequent and continuing contact of the child with both parents consistent with . . . [the welfare and best interest of the child]." Ark. Code Ann. § 9-13-101(b) (Repl. 2020). We have consistently held that courts should restrict evidence in a modification proceeding to circumstances arising after entry of the decree. *Lewellyn v. Lewellyn*, 351 Ark. 346, 356, 93 S.W.3d 681, 686 (2002). Yet we have recognized limited exceptions when there is a showing of facts affecting the best interest of the child that were either not presented or were not known by the circuit court when the original custody order was entered. *Alphin*, 364 Ark. at 340, 219 S.W.3d at 165. Generally, courts impose more stringent standards for modifications in custody than they do for initial determinations of custody. *Id.*, 219 S.W.3d at 165. This is to promote stability and continuity in the life of the child and to discourage the repeated litigation of the same issues. *Id.*, 219 S.W.3d at 165. The party seeking

modification has the burden of showing a material change in circumstances. *Id.*, 219 S.W.3d at 165.

## B. Analysis

Here, Heileman argues that the circuit court's significant modification of the custodial schedule or parenting time was essentially a de facto modification of custody that denied him "approximate and reasonable equal division of time with the child[ren]." *See* Ark. Code Ann. § 9-13-101(a)(5) (Repl. 2020) (defining "joint custody" in Arkansas). Therefore, before making such a change, the circuit court was required to find a "material change in circumstances"—which by its own language, it clearly did not.

As previously stated by this court, the material-change-in-circumstances analysis is not triggered if neither party seeks an actual change of custody or when there is no issue of visitation because the parties maintain joint custody. *Nalley v. Adams*, 2021 Ark. 191, at 6, 632 S.W.3d 297, 301. While this remains true, the facts in *Nalley* are easily distinguishable from the facts at hand.

In *Nalley*, when the agreement regarding custody was made, the mother and father lived more than two hours away from one another. Despite the living situation, the parties stipulated to "joint legal custody" with the mother serving as the "primary caregiver." The court fashioned a "visitation schedule" after acknowledging that the distance between the parents' residences made it difficult for both parties to have adequate time with the child. Not even a year later, after a hearing on the father's motion for modification, the court found a material change of circumstances had occurred on the basis of the father's relocation and entered a new order granting the parties equal time. The order stated:

[T]he Court has already ordered, and the parties agreed, that they shall have joint legal custody of the child. The only reason in the initial Order that the parties did not share equal time with the child was that [the father] lived in Jonesboro, Arkansas and [the mother] and child lived in Little Rock, Arkansas. Since [the father] has moved to Little Rock, there is no discernable reason why each party could not share equal time with the parties' [minor child]. The law is clear in Arkansas that joint custody with equal time is favored.

*Nalley*, 2021 Ark. 191, at 5, 632 S.W.3d at 300.

The mother appealed, and the circuit court's order was affirmed. *Nalley*, *supra.* As an initial point, the modification sought in *Nalley* was to have the parents move *toward* exercising true joint physical custody rather than, as in this case, a desire to deprive one parent of the time he or she is currently enjoying with their children. Second, because the initial determination was agreed-upon "joint custody," the father simply wanted his physical custodial schedule to mirror the rights already awarded to him by the court. Contrast that with Cahoon's request for a modification reflecting "full" custody, while reducing Heileman's time with the children to visitation only.

In Arkansas, one thing is clear—our legislature has determined that joint custody is favored, with the award of custody being made in accordance with the welfare and best interest of the child. Ark. Code Ann. § 9-13-101(a)(1)(A)(i) & (iii) (Supp. 2023). And while an equal division of time is the goal, it is not always possible in light of the relevant facts and circumstances of the parties. Litigants, lawyers, and circuit courts alike need to understand the weight an initial custody determination is given—whether agreed on by the parties or litigated before the court. And when circuit courts are adjusting parenting time, they should be cognizant of the terminology they use and pay attention to whether an adjustment in schedule might turn into a de facto change in custody. Moving forward, after an award of

8

joint custody is reduced to a court order, the only way to modify away from joint custody, absent an agreement of the parties, is by proving *both* a material change in circumstances *and* that the modification is in the best interest of the child. Without making these required findings, the circuit court essentially eliminated joint custody in this case by reducing Heileman's parenting time from 50 percent initially to roughly 26 percent now. While courts cannot always make the parenting time an even split, the disparity here was too great. Further, while it is understandable that school and work schedules may change as children age, the appropriate response of the courts is to seek ways to modify the custodial schedule consistent with the law, the ability of the parties, and best interest of the children, rather than to simply reduce parenting time from roughly half to just two weekends a month, as was done here.[4] [5]

In this instance, the entirety of the evidence did not support the court's effective elimination of joint custody relegating Heileman to visitation only. There was no evidence presented that an equal or near equal division of time was unworkable or that an equal or near equal division of time would result in a detriment to the children. With no satisfactory

---

[4]Heileman's weekend visitation was extended visitation—from Thursday afternoon when school recessed to Monday morning when school resumes—rather than the traditional weekend visitation of Friday afternoon to Sunday evening.

[5]For example, while the bifurcated schedule of Monday and Thursday with one parent and Tuesday and Wednesday with the other parent that was adopted before the children began school may have become unworkable now that the children are in school, the parties demonstrated through the summers that they are able to manage a one-week-on, one-week-off parenting time rotation—and the testimony presented at trial was that such a rotation would be feasible with Heileman's work schedule, as well. While the circuit court is in the superior position to determine precisely what the parenting time schedule should be, it must do so in a way that is consistent with the law and that follows the standards set forth by this court.

best-interest analysis and without a material change in circumstances, we are left with the conviction that the circuit court clearly erred by changing the custodial arrangement.

## III. *Contempt*

As noted above, the circuit court found Heileman in contempt for failure to pay both alimony and child support as originally ordered. However, the court deferred sentencing for a period of ninety days to allow Heileman the opportunity to "purge himself of contempt by paying the balance" in back alimony and back child support. Heileman appealed only the finding of contempt for alimony. Generally, a finding of contempt is a final, appealable order. *Holifield v. Mullenax Fin. & Tax Advisory Grp.*, 2009 Ark. App. 280, 307 S.W.3d 608. However, it must be a final contempt order. Pursuant to Ark. R. App. P. –Civ. 2(a)(13), a final, appealable contempt order "imposes a sanction and constitutes the final disposition of the contempt matter." An order of contempt is not final and appealable when no sanctions have been imposed. *Shafer v. Estate of Shafer*, 2010 Ark. App. 476. An order merely announcing the court's determination of the rights of the parties, but contemplating further judicial action, is not appealable. *Id.*

In the present case, the court has not yet imposed the sanctions for Heileman's contempt. While the judgment amount was computed, sanctions have not been determined. *See Allen v. Allen*, 99 Ark. App. 292, 259 S.W.3d 280 (2007). Thus, because the contempt matter is not yet concluded, we cannot address the issue at this time.

Reversed and remanded; court of appeals opinion vacated.

WEBB, J., dissents.

**BARBARA W. WEBB, Justice, dissenting.** Joint custody is defined as the "approximate and *reasonable* equal division of time" with the children by both parents. Ark. Code Ann. § 9-13-101(a)(5) (Repl. 2020) (emphasis added). Here, the circuit court did not change the award of joint custody but instead simply amended the division of parenting time based on a change of circumstances—David's deliberate choice to accept an out-of-state job. Given the testimony that David's work schedule was creating difficulties for the children, I cannot say that the circuit court clearly erred in reducing David's parenting time. *See Nalley v. Adams*, 2021 Ark. 191, at 5, 632 S.W.3d 297, 301. By supplanting the circuit court's judgment with its own, the majority needlessly upends an order that has been in place since 2022 and sends a family back to court.

I dissent.

*James & Streit*, by: *Jonathan R. Streit*, for appellant.

*Emerson Law Firm*, by: *Scott Emerson*, for appellee.