Cite as 2026 Ark. App. 97

# ARKANSAS COURT OF APPEALS
## DIVISION III
No. CV-25-252

| | |
|---|---|
| ASHLYNN PETERS (NOW STEVENS) <br> APPELLANT | Opinion Delivered February 11, 2026 |
| | APPEAL FROM THE BENTON COUNTY CIRCUIT COURT [NO.04DR-16-1873] |
| V. | |
| DYLAN PETERS <br> APPELLEE | HONORABLE XOLLIE DUNCAN, JUDGE |
| | REVERSED AND REMANDED |

**WAYMOND M. BROWN, Judge**

Appellant Ashlynn Peters, now Stevens, appeals from the Benton County Circuit Court's order granting appellee Dylan Peters's motion for modification of visitation with the parties' daughter, Minor Child (MC).[1] Appellant contends that the circuit court erred in modifying visitation because there was no material change in circumstances and because the order failed to sufficiently determine that the modification was in MC's best interest. We agree that there was no material change in circumstances, and we reverse and remand.

The parties were divorced by a decree of the circuit court entered on December 5, 2016. Appellant was granted custody of MC, and appellee was granted visitation from 9:00 a.m. Saturday to 9:00 a.m. Sunday, every other week. The decree provided that the visitation

---

[1]Born in 2015.

would take place at the home of Monica Peters, appellee's mother, located at 10900 Silver Hollow Road, in Lowell, Arkansas. The decree also allowed the parties to agree to additional visits if they desired. Appellee was ordered to pay $57 in weekly child support. The decree noted that MC was currently on ARKids First health insurance (ARKids) but stated that appellee should maintain MC's health insurance if she no longer qualified for ARKids. The parties were also ordered to equally divide any uncovered medical expenses. Appellee filed a petition for modification of visitation on January 30, 2024. He alleged that there had been a material change in circumstances to justify a change in visitation: (1) MC is now older, and it would be in her best interest to have more time with appellee; (2) appellant agreed to expanded visitation but had since stopped because appellant is jealous of appellee's romantic relationship; and (3) pursuant to the decree, appellee was ordered to effectuate his visitation with MC at his mother's home, but appellant had refused to allow MC to go to Monica's house for visitation. Appellant responded on March 1, denying the material allegations of appellee's petition and asking the circuit court to deny appellee's motion.

On March 1, 2024, appellant also filed a petition for modification of the divorce decree, for appointment of an attorney ad litem, and for drug testing of appellee. Appellant alleged that (1) appellee's income had increased enough to constitute a material change in circumstances to warrant recalculation of child support; (2) appellee was to cover MC's health insurance if she no longer qualified for ARKids and had failed to do so; (3) appellee

2

has a history of marijuana use and smokes marijuana in MC's presence,[2] warranting a drug test; (4) MC returns from visits with appellee exhausted and with headaches because she is not getting sufficient sleep; and (5) an ad litem is needed to represent MC's needs. On March 4, appellant filed a petition to show cause and for contempt alleging that appellee had failed to meet his child-support obligation as ordered by the circuit court and now owed $13,500 in arrears.[3] Appellant asked that appellee be made to show cause why he had not paid child support as ordered and be held in contempt. Appellee filed answers to both of appellant's petitions on March 21, denying the material allegations. The circuit court appointed an attorney ad litem on April 18, and the ad litem filed an entry of appearance on April 24.

Because Monica's behavior caused the ad litem some concerns, Monica was ordered to submit to a 180-day seventeen-panel hair-follicle test on October 10. The test showed that Monica was positive for both amphetamines and methamphetamine. A temporary order was entered on October 15 that ordered both parties to discontinue any contact between MC and Monica until a clean drug screen was filed with the circuit court. Even after a clean drug screen, the party wishing to allow contact between Monica and MC must submit an

---

[2]MC will smell marijuana and comment that it is cigarette smoke. Appellant does not smoke marijuana or allow marijuana to be smoked in MC's presence.

[3]Appellant included as an exhibit a screenshot of the Office of Child Support Enforcement's (OCSE) website showing appellee's balance.

3

order to the circuit court allowing Monica to resume contact with MC. The order also prevented Monica's husband, Jared Peters, from having contact with MC.

A hearing took place February 3 and 10, 2025. Brenda Harrison, appellee's grandmother, testified that appellee is remarried with newborn twins. She stated that appellee lived with her for about three years before he was married and moved out after he got married. She said that appellee exercised visitation with MC at her home, and she was able to see that they have a good relationship. She testified that MC stayed with appellee at her home every other weekend, from Friday to Sunday. She stated that appellee was able to exercise this extended visitation until he started dating his current wife around early 2023. She also said that MC was able to go with them to their cabin in Newton County two or three times over the years during the summer. She stated that appellee would have MC for either Christmas Eve or Christmas Day each year. She said that after appellant stopped allowing extended visitation with appellee, appellant asked for permission to take MC to Europe and promised appellee that she would again let him exercise extended visits, but appellant did not keep her word. According to Brenda, appellant reverted to the original visitation schedule. She testified that appellee was always with MC. She stated that MC would sometimes stay at her house during visitation and she would sometimes stay at Monica's house. She admitted that the restriction that visitation takes place at Monica's house was not being followed but stated that appellant never said anything about it. She stated that appellant gave MC a "track phone" so she would know every room MC went in.

On cross-examination, Brenda testified that appellee was also present during the Newton County trips and that they usually stayed there three to four days. She said appellee married his wife after about six months of dating. She stated that during this time, visitation mostly took place at Monica's house because MC wanted to see her. Brenda denied threatening to spank MC if she told appellant anything about visitation, but she admitted that she had threatened to spank MC for other reasons. She stated she did not know about Monica's substance-abuse problems but said that she was aware that Monica tested positive for methamphetamine. She also stated that she did not know that Monica admitted she had an opiate addiction. She testified that appellee told her about three years ago that he smokes marijuana. However, she said that she has never seen appellee use it. She agreed that visitation occurred wherever appellee was living.

On cross-examination by the ad litem, Brenda testified that the "track phone" appellant gave MC was different than "a cell phone." She stated that it looked like a flip phone, but MC was texting on it. She said that she knew that it was a "tracking phone" because appellant told appellee that she knew every move MC made. She subsequently stated that she did not know if it was a tracking phone. She said that since appellee has been married, she has not asked to take MC to the cabin in Newton County.

On redirect, Brenda testified that she had not seen any signs of substance abuse in Monica. She stated that Monica told her she had taken a hair-follicle test that showed methamphetamine in Monica's system. She said that she did not know Monica was "doing anything," and she did not suspect that Monica was using methamphetamine. However, she

5

stated that Monica's husband, Jared, did have a problem with methamphetamine. On recross, Brenda stated that she learned Jared had a methamphetamine problem when he checked himself into rehab. On recross by the ad litem, Brenda stated that it would not surprise her if she heard Monica talking about UFOs outside her home, and she would not be concerned if Monica said that aliens were watching her house. Brenda said it would cause her concern if Monica said these things to MC.

Appellee testified that he married his wife, Kassandra, on August 6, 2023. He stated that they dated for about a year before they were married but that he had known Kassandra his whole life. He stated that their twins were just born in December. He said that after his divorce from appellant, his visitation with MC was one day one weekend; and maybe two days the next visitation. He stated it was "just hit or miss" and that they would communicate with each other "and work something out[.]" He said they alternated holidays. He stated that he would also get MC on her birthday. He testified that the visits with MC took place at both Monica's and Brenda's houses, and they deviated from the provision in the decree requiring the visit to take place only at Monica's house. However, he said that appellant did not like MC to be at Brenda's house. He stated that when he lived at Brenda's house, he was able to pick MC up on Friday evenings and take her back around five o'clock Sunday evenings. He testified that this arrangement continued until the video of Monica talking about aliens surfaced. He said that in July 2023, he was able to keep MC for a week and that he took her to Silver Dollar City for a couple of days during that visitation. He stated that he believes MC has a good relationship with both Brenda and Monica. He said that MC

6

seems disappointed when she cannot spend time with Monica. He testified that he does not believe Monica abuses methamphetamine because she "can sleep at night and sleeps like a normal person. And, from what [he] know[s], meth does not let you sleep, you're up, your eyes are the size of cue balls. [He doesn't] believe [Monica] was on any drugs." He also stated that his dad's drug use was a surprise to him. He said that from 2019 to 2023. they would revert to the court-ordered visitation schedule if he did not get MC to bed or make her brush her teeth or shower because appellant thought he was irresponsible. He testified that he filed his petition because he wants more time with MC, and he believes she wants more time with him also. He stated that when he filed his petition, he was receiving only the court-ordered visitation, and he was not receiving any holiday visitation unless the holiday fell on his weekend. He said he believes that MC is sad because she cannot go to church with him. He stated that MC is excited about having twin sisters and that he would like for her to be able to spend more time with them.

On cross-examination, appellant stated that he works for Outdoor Cap Company and makes $16 an hour. He stated that he became eligible for health insurance in October 2024 but that he did not put MC on his insurance, even though he was ordered to do so in the divorce, because MC was on appellant's husband's insurance. Appellee acknowledged that at the time of the divorce, he agreed to have visitation only one night every other weekend. He stated that he had not kept up with either the child support he agreed to pay or his part of the out-of-pocket medical expenses. Appellee was able to introduce a stipulated exhibit

7

from OCSE showing that he owed $5,846.05 in child-support arrears as of February 6, 2025. Appellee said he believes MC's getting older constitutes a material change in circumstances.

He also said he believes appellant's decision to go back to the court-ordered visitation is a material change. He testified that appellant told him she was reverting back to the order because she did not want MC around Monica and Brenda and because she had problems with his parenting skills. He admitted that even though his motion states that his visitation with MC was reduced because appellant was jealous of Kassandra, he conceded that there was no evidence to support his contention. Appellee said that it was during his visitation with MC the week of July 2023 that the video of Monica talking about UFOs and aliens came out. MC had recorded Monica on her cell phone, which has the application Life360 installed. Appellee admitted that Jared did not show the symptoms of methamphetamine use that he stated Monica lacked. He testified that he was confident Monica had not used methamphetamine. He stated that he was a child when Monica became addicted to opiates. He agreed that after the video of Monica surfaced, visitation would no longer take place at Monica's house.

Appellee stated that MC used to stay up to 2:00 a.m. watching television when she visited, even though he would have her in bed at least by 11:00 p.m. He acknowledged that MC gets migraines when she does not get enough sleep. He stated that the last visit he had with MC before the hearing, the entire family (including MC) slept in the living room because the twins were fussy. He admitted that this was not a good idea for someone who gets migraines. He stated that MC attends Lisa Academy, but he was unsure who her teacher

8

is. He said that he had not attended a parent/teacher conference this year because he was not invited to. He stated that he has never contacted MC's school and asked for copies of her grades or anything because he believed that he is not listed as MC's father at her school. He admitted that he has never contacted any school MC has attended or had lunch with her at school. He said that he was unsure of the physical location of MC's school. Appellee did not know the name of MC's doctor or what extracurricular activities she was currently involved in. He had to refer to an exhibit that had not been yet admitted to find the name of where MC goes to counseling. Appellee stated that he checked on MC sometime after appellant had picked up MC from his house and taken her to the doctor, but he had no proof of it. He testified that he has a medical marijuana card, but he stopped smoking marijuana two months ago because he did not like it anymore; that he used to spend about $100 a month on marijuana; and that he would only smoke twice before bed. He admitted he had smoked while MC was in his home but stated that he smoked off the property. He subsequently said that he smokes other than at bedtime to help with his anxiety. He stated that if MC had smelled his marijuana, he would have told her that he was smoking cigarettes. He testified that he would "go through spurts of smoking and then [go] months without smoking" depending on his needs and his anxiety. Appellee stated that MC went to Monica's only if he had to work, which was about half the visits.

On cross-examination by the ad litem, appellee stated that he asked for visitation with MC every Thanksgiving since the divorce but has received only two Thanksgiving visits. He said the iPhone appellant gave MC was referred to as a "tracking phone" because that is

why appellant gave it to her—to track her location. He admitted that he also has Life360 on his phone but does not refer to it as a tracking phone. He said MC's phone is the only phone he refers to as a tracking phone. He said that he remembers agreeing to not send MC to Monica's house in April or May 2023 after Monica refused to take a drug test, but he admitted that he did send MC to Monica's in the fall, leading to the ad litem's obtaining a court order for Monica to submit to a hair-follicle test, which she failed. He said that in his eyes, Monica was not on methamphetamine even after her positive drug test because Monica is responsible, sleeps regularly, and is a great grandmother to her grandkids. He also said that he practically saw Monica daily, so he knows that she was not on methamphetamine. Appellee stated that he has stopped smoking marijuana and started back twice during the pendency of this case. He said that he had never been notified of any parent/teacher conference. He testified that even though he had known for a year that MC was in counseling, he never reached out to or attempted to speak with her counselor.

On redirect, appellee stated that he reached out to appellant in 2019 and asked to help him out after he received letters stating that his license was going to be taken and he was going to be arrested for not paying child support. He said that appellant wrote a letter stating she no longer wanted child support, and as a result, he stopped receiving the letters and bills. He testified that he subsequently began receiving the letters and bills again, prompting him to resume his child-support payments. He said that he was never invited to any of MC's counseling sessions. He stated that he and appellant do not communicate well and that he does not know why. He said that until a couple of years ago, he contacted

10

appellant, but she told him that all communication concerning MC must go through appellant's husband, Charlie. He testified that he had lost two visits with MC because appellant had taken her out of the state. He denied that MC ever complained about migraines while at his house. He asked that his visitation be modified because he is tired of seeing MC upset and crying with a broken heart when she cannot attend church with him or cannot wear a new church dress or something. He said that every time he has MC, she is upset and wants to spend more time with him. He stated that he has expressed his concerns with appellant, but she only reiterates what his schedule is. He testified that he would love for MC to spend more time with her baby sisters because she has been a good big sister. He said that she offers to help with them and to hold them without being asked. He opined that MC has a good relationship with everyone in his family. He stated that Monica frequently watched MC when she was younger and that he believes appellant knew that Monica was in a treatment program during that time.

On recross, appellee denied saying that he was wrong about appellant's jealousy being the reason appellant cut off his extended visitation. He admitted that he paid $3,000 towards his arrears shortly after appellant filed her motion for contempt but stated that the timing was just a coincidence. He denied that appellant asked him to communicate through Charlie about MC because he was threatening and cursing at appellant. He admitted that he and appellant started communicating again in 2022.

Monica testified that she has been addicted to pain medication since 2008 after she underwent eight or ten surgeries within a short amount of time. She stated that she is on

11

Suboxone, which is a maintenance drug for opiate addiction. She said that she has not reverted to pain pills since 2008. She stated that she currently sees Dr. Dixon monthly for her treatment plan, and she submits to a urine test each time. She said that she has never failed her urine tests. She denied using methamphetamine and stated that she learned that Jared used methamphetamine without her knowledge. However, she stated that she has never taken it or been around it. She testified that she is prescribed about eleven different medications for her medical conditions. She stated that she tested positive for amphetamines because of the Adderall she takes.

On cross-examination, Monica testified that appellee would sometimes leave MC with her during his visitation, and the last time he left MC with her was around August 2023. She stated that if appellee had MC for the entire weekend, she would typically have her one of those days. She said that appellee did not usually spend the night at her house with MC. She testified that when appellee had MC for a week, MC stayed three or four nights at her house. She stated that appellee spent the night a "couple of times." She said that MC had a phone that she used to report things and that MC also recorded interactions with her. She admitted that she tested positive for methamphetamine in October 2024 but stated that she had no prescription that would have caused the positive result. She stated that she could not remember if she told appellant that she has an opiate addiction. She said that she is under treatment but that she will always be addicted. Monica underwent another hair-follicle test a few weeks before the hearing, and it was positive only for amphetamines. She admitted that it was not the same hair-follicle test as before. When asked why she did

not take a hair-follicle test paid for by appellee in April or May 2024, Monica said that she did not have anyone to look after her grandkids and that she did not have a car. She stated that her daughter-in-law watched her grandkids for her most recent test. Monica testified that it would not surprise her to know appellee said that MC never stayed over at her house during the visitations because Monica's "memory [was] not the best."

On cross-examination by the ad litem, Monica stated that she and Jared had been separated for about two years, but they were still living in the same house, just sleeping in separate bedrooms. She said that Jared left in June. She testified that she never saw Jared do methamphetamine. She stated that she was court ordered to take a hair-follicle test about six months after appellant tried to pay for one for her. Monica could not explain why she tested positive in the second segment of the hair-follicle test (90 days), which covered the time after Jared had left.

Appellant moved to dismiss appellee's motion to modify visitation, contending that there had been no material change in circumstances. The circuit court denied the motion.

Appellant testified that she has been married to Charlie Stevens for five years and has a two-year-old daughter in addition to MC. She said that MC attends Lisa Academy in Fayetteville, which is about five minutes from her home in Springdale. She stated she informed appellee when she made the decision to remove MC from John Tyson Elementary. She said MC is in the fourth grade and has a grade of three. She stated that MC's favorite subjects fluctuate between math and reading. She said that the last parent/teacher conference was in October and took place via Zoom. She testified that MC is in the Lisa

13

Academy cheer club, which meets after school every Thursday. She said these practices are not open to the parents. She stated that MC began counseling at Eason Counseling in August 2023 after they began noticing issues with her in July. She said that MC seemed to be very stressed. She stated that although there has been no diagnosis, MC goes to counseling once or twice a month. She said she has met with the counselor at least twice to discuss MC's treatment and that she has also had random conversations with the counselor. She testified that appellee was allowed to have phone visitation with MC every Thursday, but he did not utilize it. When asked what concerns she had with appellee receiving more visitation, she stated that appellee was not utilizing the visitation he did have and was leaving MC with Monica. She stated that she also had concerns about drug use because appellee denied using drugs. She said that she was unaware of Monica's longstanding opiate treatment and that had she been aware, she would not have allowed Monica to keep MC. She stated that after she uncovered a video of disturbing behavior by Monica from MC's phone around July 2023, she told appellee that MC was not to be around Monica. She denied stopping extended visitation because she was jealous that appellee was dating someone.

Appellant testified that MC gets migraines when she does not get enough sleep. As a result of the migraines, MC becomes nauseous and upset and begins crying. She said she gave MC a bedtime and informed appellee of the importance of MC having a set bedtime. She stated that she also has concerns about MC sharing a bedroom with the twins. Appellant testified that she told appellee that MC should not consume junk food due to her medical

issues, but appellee does not listen and usually returns MC on Sunday mornings with a hamburger, fries, and a Coke. She stated that MC has alternated insurance between ARKids and Charlie's insurance over the years. She said that appellee never told her that his job provides insurance and he never told her about any change in his pay. She testified that the $13,000 figure for arrears was a mistake and that appellee was behind about $9,000. She said that appellant paid over $3,000 once she filed her petition. She stated that appellee made the payment to keep from having his tax refund intercepted, which had happened before. She said that when appellee's tax refund was taken, he asked her to return the money to him so he could send it through the OCSE website to get caught up. Appellant stated that she did not believe there had been a material change in circumstances to warrant a modification of appellee's visitation, and she did not believe modification was in MC's best interest because appellee had ignored her different concerns. Appellant testified that she had to pick MC up from appellee's house because she was sick one night. She stated that she took MC to the doctor that Monday, but she never heard anything from appellee.

On cross-examination, appellant stated that MC called her crying the night she picked MC up from appellee's house. She said that she informed appellee that she was going to take MC to the doctor. Appellant admitted that she signed a letter and took it to OCSE in 2018 or 2019, asking that they stop enforcement of the child support. She said that after that, she did not receive child support for a while. She agreed that since 2022, appellee had paid more than the court-ordered amount for child support because of his arrears. She stated that both of her children are on Charlie's insurance and that she wanted to keep MC on

15

that insurance. She said that she told appellee she was putting MC in private school, but he never offered his opinion about it. She stated that appellee could have set up his own parent/teacher conference when MC was at Tyson Elementary. She admitted she did not invite appellee to the Zoom conference at Lisa Academy. She testified that she told appellee that MC was going to be in counseling but never invited him to a session because she leaves it up to MC if she wants someone with her. She said that she gave appellee the Thursday call as an option for him to use. She stated that from time to time, she allowed appellee to have MC for the full weekend, but it was never on a consistent basis. She said she pulled back when she felt MC's safety was at risk. Appellant denied that MC ever went to Newton County for three or four days. She stated that appellee's Christmas visitation schedule was kind of flexible. She said that appellee never asked to get MC for a week over the summer, and she never offered due to her concerns. She stated that appellee had MC once for her birthday because he asked to have her. She said MC had come home from visits sad but said that it was not because the visit had been cut short. Appellant stated she has tried to encourage a good relationship between MC and appellee by including appellee in "events and things that go on in her life," including her recitals, and letting him know how MC is doing in school. She said the last time appellee dropped MC off at home, MC had a Coke. She stated that she lives fifteen to twenty minutes from appellee and that since 2020 he has been providing the transportation for visitation. She said that she does not allow MC to attend church with appellee because she does not like appellee's church.

On cross-examination by the ad litem, appellant stated that she asked appellee to communicate through Charlie because appellee would call her names, curse at her, and threaten her. She said that appellee communicated through Charlie for a little over a year. She stated that appellee should have asked for more time with MC if he wanted it. She said that she does not like appellee's church because it teaches that "women should not speak in church" and that there were other scenarios that she did not feel were right for MC's future. She explained that she lets MC decide if someone goes to counseling with her because she does not want that to be the reason MC does not express herself during those sessions. She said that she picked MC up from appellee's house on December 21 because MC called saying that she was sick. She stated that she waited a few days to see if MC's symptoms were related to her migraines. She said that she subsequently took MC to the doctor, and the doctor said it might have been some "viral thing."

On redirect, appellant testified that she wrote the letter to OCSE in 2018 because she felt pressured to do so. She stated that Jared called harassing her and that appellant called her asking if she could do anything about the child support. She said that MC got back on ARKids in 2021 and OCSE began enforcement of the child-support order. She testified that appellee's payments were sporadic once child support resumed.

Appellant rested and renewed her motion to dismiss, which the circuit court denied. The ad litem expressed that MC wanted to continue living with appellant, but she wanted her visitations with appellee to be for two nights instead of one. The ad litem expressed concerns that appellee leaves MC with Monica but asks for more time. She was also

17

concerned that appellee could not accept that Monica is on drugs, even after the positive drug test. She stated that appellee was not the best judge of character for drug use. She said that she also had serious concerns about appellee's parenting choices because even after Monica's drug use was brought to his attention, appellee still sent MC to Monica's house. She asked the circuit court to order no marijuana use when MC is visiting and to prohibit anyone from referring to MC's phone as the "tracking phone." The ad litem opined that appellant needed some direction on notifying appellee of MC's achievement, grades, and other information received from the school. She stated that there was no basis to modify custody and that appellee was not exercising the visitation he has as much as he should.

The circuit court found that there had been "a substantial change" and that it was in MC's best interest to spend more time with appellee. The order for contempt and modification of visitation was filed on February 14, 2025. It stated in pertinent part:

> 11. Further, the Court finds a substantial change of circumstances so as to now find that it is in the minor child's best interest to modify the parties' Decree of Divorce and expand [appellee's] visitation with his daughter to that as set forth in the Benton County Suggested Standard Visitation Schedule, attached hereto as Exhibit "B" and incorporated herein and made a part hereof, to include the following terms:
>
> (a) Defendant shall have no midweek visitation;
>
> (b) Defendant shall not use, nor be under the influence of, marijuana at any time during such visitations;
>
> (c) That either parent is permitted to communicate with the minor child while she is with the other parent. Such communication(s) shall be on a reasonable basis. Any references to the child's phone shall simply call it a "phone" and not a "'tracking phone" or words to that effect;

18

(d)     That the [appellant] shall keep [appellee] informed as to the [MC's] progress in school, parent teacher conferences, information she receives from [MC's] school, and extracurricular activities of [MC]. [Appellant] shall provide the [appellee] with the contact information for [MC's] school, teacher, counselor and all medical providers[;]

(e)     [Appellee] needs to be more involved and proactive with [MC's] school, extracurricular and counseling activities[;]

(f)     That until such time as a negative drug test for methamphetamine is filed with the Court, Monica Peters shall not be allowed visitation with [MC].

Appellant timely appealed the circuit court's order.

In reviewing domestic-relations cases, appellate courts consider the evidence de novo.[4] We will not reverse the circuit court's findings unless they are clearly erroneous.[5] When the question whether the circuit court's findings are clearly erroneous turns largely on the credibility of the witnesses, we give special deference to the superior position of the circuit court to evaluate the witnesses, their testimony, and the child's best interest.[6] A circuit court maintains continuing jurisdiction over visitation and may modify or vacate those orders at any time when it becomes aware of a change in circumstances or facts not known to it at the time of the initial order.[7] Although visitation is always modifiable, to promote stability and

---

[4]*Brown v. Brown*, 2012 Ark. 89, 387 S.W.3d 159.

[5]*Id.*

[6]*Id.*

[7]*Id.*

continuity for the children and to discourage repeated litigation of the same issues, courts require more rigid standards for modification than for initial determinations.[8] Thus, the party seeking a change in visitation has the burden to demonstrate a material change in circumstances that warrants such a change.[9] The primary consideration regarding visitation is the best interest of the child.[10] A parent cannot use the circumstances he created as grounds to modify visitation.[11]

Appellant argues as her first point on appeal that the circuit court erred in modifying visitation because there was no material change in circumstances. We agree. The circuit court found that a substantial change of circumstances supported modification of the parties' visitation; however, our de novo review of the evidence does not support the circuit court's modification of the parties' visitation schedule in favor of appellee. In his petition to modify custody, appellee alleged that the fact that MC had gotten older was a material change in circumstances. We have held that the mere fact that a child has gotten older does not constitute a material change in circumstances sufficient to warrant a modification of visitation.[12]

---

[8]*Id.*

[9]*Id.*

[10]*Id.*

[11]*See id.*

[12]*See Bray v. Bray*, 2020 Ark. App. 111, 595 S.W.3d 72.

Appellee also alleged that appellant had agreed to extended visitation and had since stopped due to jealousy of appellee's romantic relationship. It should be noted that appellee testified on at least two occasions that this was not true and even stated that extended visitation was stopped because appellant did not want MC around Monica and Brenda and that appellant had problems with appellee's parenting skills. The divorce decree gave appellee visitation with MC one night, every other weekend. Appellee agreed to this schedule. The order also stated that visitation could be extended if the parties wanted it to. However, there was nothing stating that once additional visitation was granted, it had to remain, even if against the desires of one party. The ad litem disagreed that appellee should have more time when he was not using the time he already had with MC but was allowing Monica to have MC at least half the time. It is hard for us to find a material change in circumstances where a party is following the court-ordered visitation schedule.

Finally, appellant contended that a material change had occurred because appellant refused to let MC go to Monica's house for visitation as contemplated by the divorce decree. The evidence showed that appellee exercised visitation wherever he lived and did not follow the terms of the decree as it related to where visitation should take place. Evidence also showed that appellant was concerned about MC's safety around Monica, and rightfully so because a video subsequently surfaced with Monica discussing UFOs and aliens with MC. Monica later tested positive for methamphetamine and admitted she has an opiate addiction and must follow a treatment plan and take a maintenance drug. Thus, we cannot say that appellant's failure to allow visitation at Monica's constituted a material change in

21

circumstances. Therefore, we are left with a firm conviction that the circuit court erred by modifying visitation.[13] Because we agree with appellant that there was no material change in circumstances in this case, we need not address the circuit court's best-interest finding.[14]

Reversed and remanded.

WOOD and HIXSON, JJ., agree.

*Matthews, Campbell, Rhoads, McClure & Thompson, P.A.*, by: *Sara L. Waddoups*, for appellant.

One brief only.

---

[13]*See Heilman v. Cahoon*, 2024 Ark. 164, 699 S.W.3d 85.

[14]*See Reynolds v. Reynolds* (if the threshold requirement of a material change in circumstances is not met, there is no need for a best-interest finding).